**Dwight MILLER, Respondent,**

v.

**HO KUN YUN a/k/a Kun Y Ho, et al., Defendant,**

**American Family Mutual Insurance Company, Appellant.**

**No. WD 74890.**

Missouri Court of Appeals,
Western District.

Feb. 5, 2013.

Application for Transfer Denied
March 5, 2013.

Joseph A. Cambiano, Kansas City, MO, for respondent.

David Ryan Frye, Overland Park, KS, for appellant.

Division One: JAMES M. SMART, JR., P.J., LISA WHITE HARDWICK and GARY D. WITT, JJ.

JAMES M. SMART, JR., Judge.

American Family Mutual Insurance Company ("AmFam") appeals a summary judgment granted to Respondent Dwight Miller. AmFam contends that its auto insurance policy issued to Mr. Miller providing Underinsured Motorist ("UIM") benefits defines in unambiguous language the term "underinsured motor vehicle" and precludes the payment of UIM benefits in this case. AmFam also argues that application of the policy's "Limits of Liability" language does not justify the decision of the trial court. We affirm the decision of the circuit court.

### The Factual Background

The facts are undisputed. Dwight Miller was a passenger in a vehicle driven by his wife and owned by his mother-in-law when the car was involved in a collision with a vehicle recklessly driven by Ho Kun Yun. As a result of the collision, Mr. Miller suffered injuries that the parties agree exceeded $200,000. At the time of the collision, Mr. Yun's vehicle was insured under a policy of insurance issued by Geico Insurance Company that provided bodily injury liability limits of $100,000 per person. Geico did not dispute the liability of its insured and paid the $100,000 limits of its policy to Mr. Miller.

### The UIM Endorsement Provisions

The car in which Miller was a passenger was insured under a policy issued by American Family, which provides a UIM benefits endorsement with stated limits of $100,000 per person/$300,000 per accident (as shown on the declarations page of the policy). The AGREEMENT section of the policy states:

> We agree with you, in return for your premium payment, to insure you subject to all the terms of this policy. We will insure you for the coverages and the limits of liability as shown in the declarations of this policy.

The UIM endorsement provides, in pertinent part, as follows:

> We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle. The bodily injury must be sustained by an insured person and must be caused by accident and arise out of the use of the underinsured motor vehicle.[1]

---

1. The briefs of the parties indicate that the phrase "underinsured motor vehicle" is bolded. In the policy provided the trial court in the form of an exhibit, the bolding is less than clear. A copy is reproduced in the appendix to this opinion.

You must notify us of any suit brought to determine the legal liability or damages. Without our written consent we are not bound by any resulting judgment.

We will pay under this coverage only after the limits of liability under all bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

. . . .

As used in this endorsement:

. . . .

> 3. Underinsured motor vehicle means a motor vehicle which is insured by a liability bond or policy at the time of the accident which provides bodily injury liability limits less than the limits of liability of this [UIM] coverage.[2]

The policy's UIM endorsement also contains certain exclusions from coverage (not relevant here) and has a section entitled "Limits of Liability" that states, in part, as follows:

> The limits of liability of this coverage as shown in the declarations apply, subject to the following:
>
> 1. The limit for each person is the maximum for all persons as the result of bodily injury to one person in any one accident.
>
> 2. Subject to the limit for each person, the limit for each accident is the maximum sustained by two or more persons in any one accident.
>
> We will pay no more than these maximums no matter how many vehicles described in the declarations, insured persons, claims, claimants or policies or vehicles are involved.

The limits of liability of this coverage may not be stacked onto the limits of liability of any other underinsured motorist coverage issued by us to you or any member of an insured person's household.

. . . .

The limits of liability of this coverage will be reduced by:

> 1. All payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle.
>
> 2. All payments under the Liability coverage of this policy.
>
> 3. All payments made or amounts payable because of bodily injury under any workers' compensation or any similar law.

### OTHER INSURANCE

> If there are any limits of liability remaining after applying the reductions provided for in the "Limits of Liability" section of this endorsement and if there is other underinsured motorist insurance provided by another insurance company on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total remaining limits of all underinsured motorist insurance provided by other insurance companies. But, any remaining limits of insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over all other underinsured motorist insurance provided by all other insurance companies.

2. The endorsement also sets forth a description of circumstances related to vehicles that would disqualify a vehicle from being considered an "underinsured motor vehicle," none of which are pertinent here.

In the stipulation of facts submitted to the trial court, the parties quoted certain provisions that are included in the provisions quoted above. In the stipulation which quotes policy language, the terms "bodily injury," "underinsured motor vehicle," "insured person," and "use" are in bold type. In the copy of the entire policy submitted as an exhibit to the trial court, the bolding is not visible.

## The Declarations Sheet

On the Declarations sheet, under the heading "Additional Endorsements that Apply to Your Policy," there is first a rental reimbursement setting forth the amounts allowed. Then beneath that the following appears:

UNDERINSURED MOTORISTS COVERAGE—BODILY INJURY ONLY
$100,000 each person $300,000 each accident

### The Claim for UIM Benefits

After receiving the $100,000 payment from Geico, Mr. Miller filed a claim with AmFam for UIM benefits provided by the policy. AmFam denied Mr. Miller's claim for benefits, stating that the UIM endorsement did not provide applicable benefits in this instance because Yun (the driver at fault) was not driving an "underinsured motor vehicle" as defined in the policy. Yun's coverage included $100,000 per person in bodily injury liability, the same amount of AmFam's UIM coverage on the vehicle in which Mr. Miller was a passenger. Also, AmFam pointed out that the policy language entitled it to off-set the UIM endorsement policy "limits" by the amount already paid by Geico, meaning that no payment of benefits is required under the policy.

Mr. Miller filed a petition in the circuit court against AmFam seeking payment of $100,000 in unpaid UIM benefits. The parties did not dispute the underlying facts of the case. They disputed only the interpretation of the relevant insurance contract provisions.

### The Trial Court Ruling

On January 25, 2012, the court entered summary judgment in favor of Mr. Miller on his claim for UIM benefits against AmFam in the amount of $100,000. The trial court noted that the endorsement requires payment of "compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle." The court stated that the endorsement "connects the recovery to the amount that is recovered against the underinsured driver and is not subject to any other limitation at the point where this language is written in the policy." The court then noted that the endorsement further provides "we will pay under the coverage only after the limits of liability under all bodily injury liability bonds or other policies have been exhausted by payments of judgments or settlements." The court then stated:

> To the ordinary insured this would imply that American Family would pay its limits in excess of the liability of the third party after those limits are exhausted.

The court next considered the significance of the language in the AGREEMENT portion of the policy and the declarations page. The AGREEMENT section says that "we will insure you for the coverage and the limits of liability as shown in the declarations of the policy." The declarations sheet shows underinsured motorist coverage of $100,000/$300,000 coverage with no limitations. The court found the only limitation appears "at the very end of the UIM endorsement attached to the end

of the policy." We assume that the court, in mentioning the "only limitation" of the endorsement, was referring to the set-off provisions related in the "limits of liability" section. The court concluded that an insured is promised something at one point and seemingly has it "taken away at another, creating an ambiguity that should be resolved in favor of the insured." The court thus held there was underinsured motorist coverage in excess of the payments made by Geico to Miller.

AmFam appeals.

### Standard of Review

When (as in this case) the facts are undisputed, the interpretation and application of insurance policy provisions involve questions of law that we review *de novo*. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). Where, as here, the trial court granted summary judgment, we review the trial court's ruling granting a summary judgment in interpreting the insurance contract *de novo. Id.* Because the propriety of summary judgment is an issue of law, we do not defer to the trial court's order granting summary judgment. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

### General Principles of Interpretation

■ This court interprets insurance contracts by applying general rules of contract interpretation. *Todd v. Missouri United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. banc 2007). "The key is whether the contract language is ambiguous or unambiguous." *Id.* (quoting *Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 301–02 (Mo. banc 1993)). "An ambiguity exists when there is duplicity, indistinct-

ness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007); *Burns*, 303 S.W.3d at 509. "Words or phrases in an insurance contract must be interpreted by the court in the context of the policy as a whole and are not to be considered in isolation." *Haggard Hauling & Rigging Co., Inc. v. Stonewall Ins. Co.*, 852 S.W.2d 396, 399 (Mo.App.1993). A court is not allowed to create an ambiguity to distort the language of an unambiguous insurance policy. *Goza v. Hartford Underwriters Ins. Co.*, 972 S.W.2d 371, 374 (Mo.App.1998). While ambiguity exists if a term is "reasonably open" to different constructions, an unreasonable construction will not render a term ambiguous. *See Seeck*, 212 S.W.3d at 132. If an ambiguity exists in an insurance policy, the court must construe the policy in favor of the insured. *Id.* However, "where insurance policies are unambiguous, they will be enforced as written." *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc 1991).

■ The State of Missouri does not require that drivers obtain or that companies provide UIM coverage. *Id.* at 383. With the exception of only one statutory provision governing the application of UIM contracts,[3] the courts of Missouri look to the contract formed between the insured and the insurer to determine issues of coverage. *See id.* " 'In construing the [contract language], this Court applies the meaning which would be attached by an ordinary person of average understanding [when] purchasing insurance, ... resolv[ing] ambiguities in favor of the insured.' "[4] *Burns*, 303 S.W.3d at 509 (quoting *Seeck*, 212 S.W.3d at 132).

---

**3.** *See* section 379.204 RSMo (Cum.Supp. 2010).

**4.** This rule is known as *"contra proferentum"* and is applied more rigorously to insurance

■ AmFam contends that this court must first decide whether the tortfeasor's vehicle, insured for $100,000, is an "underinsured motor vehicle" as defined in the UIM endorsement of Mr. Miller's policy. AmFam also argues that if the vehicle in question does not fall within the definition of an underinsured motor vehicle, the court cannot reach any issue asserted as to any other portion of the endorsement. We do not necessarily agree with that assertion because we are required to consider all the potentially pertinent provisions of the endorsement as well. *See Seeck*, 212 S.W.3d at 133. Missouri courts will refuse to isolate and evaluate the endorsement's definition of underinsured motor vehicle in a vacuum. *Id.* at 133–34; *American Family Mut. Ins. Co. v. Ragsdale*, 213 S.W.3d 51, 54 (Mo.App.2006). In accordance with the rule expressed in *Seeck* and applied in numerous cases,[5] even if the definition of underinsured motor vehicle seems to preclude a claim in the facts of a particular case, we must still seek to determine whether other provisions of the endorsement, when read together with the definition, demonstrates the existence of an ambiguity. *Seeck*, 212 S.W.3d at 133–34.

### Analysis

■ In approaching the issues of this case, we do not necessarily limit ourselves to the arguments and the authorities discussed and relied on by the parties and the trial court. We will affirm the decision of the trial court if we can affirm it on any basis, even if it is not one of the bases argued by the respondent. *See ITT Commercial Fin.*, 854 S.W.2d at 387–88.

Because we are required to review all pertinent terms of the policy and the endorsement in order to determine whether there is an ambiguity that may be construed in favor of the insured, we start with a careful look at all the pertinent terms of the policy.

Referring again to the UIM endorsement, we note that the text advises the reader: "You have this coverage if Underinsured Motorists Coverage" is shown in the declarations. The second paragraph of the endorsement says, as noted above:

> We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle. The bodily injury must be sustained by an insured person and must be caused by accident and arise out of the use of the underinsured motor vehicle.

These two sentences are the primary focus of the initial part of the trial court decision. When we read this language in the stipulation filed in the trial court and in the briefs filed with this court, noting that certain words are in bold letters, we recognize from our experience with such policies that such bolded terms are definitional terms, and that such a defined term may serve as a fulcrum in limiting or expanding coverage.

■ The definition of "underinsured motor vehicle" is contained in the section entitled "Additional Definitions Used in This Endorsement Only." The definition of "underinsured motor vehicle," taken by itself, is clear and unambiguous. *See Rodriguez*, 808 S.W.2d at 382–83. An "underin-

---

contracts in Missouri than other types of contracts. *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 637 (Mo.App.2001).

**5.** *See, e.g., Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135, 137 (Mo. banc

2009); *Wasson v. Shelter Mut. Ins. Co.*, 358 S.W.3d 113, 121 (Mo.App.2011); *Long v. Shelter Ins. Cos.*, 351 S.W.3d 692, 700 (Mo. App.2011); *Shelter Mut. Ins. Co. v. Sage*, 273 S.W.3d 33, 36 (Mo.App.2008).

sured motor vehicle," quite simply, is a motor vehicle that is insured by a liability policy having limits that are less than the specified underinsured motorist coverage provided by the insured's coverage. *Id.* at 382. Under that definition, it is manifest that the tortfeasor, Mr. Yun, was *not* driving an "underinsured motor vehicle" within the intended meaning of the policy. Am-Fam argues that the ascertainment of that fact is the end of the analysis in this case, citing *Rodriguez. See id.* at 382–83 (definition of "underinsured motor vehicle" to the same effect regarded as unambiguous).

### A Clear Definition Does Not End the Analysis

The decision in *Rodriguez* recognized that General Accident's definition of "underinsured motor vehicle" was not ambiguous, and the decision in that case turned primarily on the basis of the definition. That decision must be understood as to its current significance in light of decisions of the Missouri Supreme Court that have followed. Subsequent decisions have made clear that the fact that a definition is clear and unambiguous does not end the inquiry as to the existence of an ambiguity until the court has reviewed the "whole policy" to determine whether there is contradictory language that would cause confusion and ambiguity in the mind of the average policy holder. *Seeck,* 212 S.W.3d at 132–33; *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690–92 (Mo. banc 2009); *Ritchie v. Allied Prop. & Cas. Ins. Co.,* 307 S.W.3d 132, 138–40 (Mo. banc 2009).

In 2007, the Court in *Seeck* was presented another case involving a clear and unambiguous definition of underinsured motorist. In that case, the Court noted that although the definition itself was not ambiguous, Missouri law precluded deciding the issue of ambiguity simply on that basis. *See Seeck,* 212 S.W.3d at 132–33. The Court said that the policy must be evaluated "as a whole." *Id.* at 133. Quoting *Lutsky v. Blue Cross Hospital Service, Inc.,* 695 S.W.2d 870, 875 (Mo. banc 1985), the Court recited the principle that if a contract "promises something at one point and takes it away at another, there is an ambiguity." *Id.* The Court approved the ruling in *Ware v. Geico General Ins. Co.,* 84 S.W.3d 99, 102–03 (Mo.App.2002), in which a Geico policy having an equally clear definition of "underinsured motor vehicle" was held to be ambiguous when the admittedly clear definition was compared to the "Other Insurance" section of the policy, which seemed (in contrast to the definitional section) to provide that the UIM coverage would be "over and above" the insurance provided by the tortfeasor's insurance. *Id.* To be specific, the "Other Insurance" clause in the *Seeck* case provided, in pertinent part:

> When an insured is occupying a motor vehicle not owned by the insured … this insurance is excess over any other insurance available to the insured and the insurance which applies to the occupied motor vehicle is primary.

*Id.* at 132.

While the Court stated that the presence of an "other insurance" clause does not always or necessarily render a policy ambiguous, *id.* at 134 n. 3, the Court found an ambiguity to be created in that case, requiring resolution in favor of the insured. *Id.* at 134. *See also American Family Mut. Ins. Co. v. Ragsdale,* 213 S.W.3d 51 (Mo.App.2006) (similar analysis and result). While *Seeck* holds that in a particular case in which the "other insurance" clause is broadly worded, an ambiguity may be found to exist, our review of the "other insurance" clause in this case shows that it does not suffer from the unfortunate breadth of the language in *Seeck.* Here, the "other insurance" clause used by

AmFam is appropriately limited in that it is addressed only to the possibility of other applicable UIM coverage under other policies, and the issue of primary responsibility. Thus, it cannot be said that the "other insurance" clause contradicts the definition of underinsured motor vehicle.

Two 2009 decisions confirm that the language of the applicable provisions of UIM endorsements will be carefully reviewed for confusion and ambiguity, particularly as to the set-off provisions (as to prior compensation received by the insured) as impacted by the "other insurance" provision. *See Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687 (Mo. banc 2009), and *Ritchie v. Allied Prop. & Cas. Ins. Co.,* 307 S.W.3d 132 (Mo. banc 2009). These cases again stress that UIM issues of coverage must take into account the entire policy, including the declaration page, which generally is less than clear that the coverage is designed by the insurer to be gap coverage rather than excess coverage. The so-called "limits" are expressed in the declaration sheet in a way that does not provide an alert for the ordinary insured that the coverage is gap coverage designed only to bring the insured to the same position the insured would have had if the tortfeasor's limits had equaled the insured's UIM coverage. This fact makes it necessary to strictly and carefully consider any language in the endorsement which might also suggest that the coverage could be considered excess. *See Jones,* 287 S.W.3d at 690–92; *Ritchie,* 307 S.W.3d at 138–40.

AmFam here ignores any confusion related to the declaration page, and maintains that the insured must carefully read the endorsement. AmFam reminds us that in automobile insurance policies, the definitions of key terms imply the existence of a limitation on coverage by virtue of a definition.

AmFam argues that the ordinary insured will read this plain language to mean that the UIM coverage will provide benefits to the insured *only* if the expressed UIM limit of liability is greater than the liability limits of the tortfeasor. "Case closed," argues AmFam. AmFam also argues that to determine the amount of available UIM coverage, the ordinary insured will, after observing the clear definition, refer to the UIM endorsement's "Limits of Liability" section. There, the set-off provision in the liability section of Mr. Miller's UIM endorsement will reinforce the definition of underinsured motor vehicle. The contract provides that:

> [t]he limits of liability of this coverage as shown in the declaration apply, subject to the following[,] [and] . . . will be reduced by: 1. All payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle.

From this provision, according to AmFam, the ordinary insured will understand 1) that the *stated limits* of liability for UIM benefits available under the endorsement will be reduced by any amounts received from the at-fault driver's liability insurance, and 2) that the UIM limits, which are subject to the stated "Limits of Liability," are found in the policy's declaration page. The effect of this provision, says AmFam, will be to set-off the $100,000 paid by Yun's insurer against the $100,000 UIM coverage provided by Miller's AmFam policy on its declaration page. Thus, the ordinary insured with $100,000 UIM coverage will realize that the UIM policy will pay no additional money in a situation in which the claimant has received payment of $100,000 for the at-fault driver's liability insurance, because: 1) the at-fault driver will not be the owner or operator of an

"underinsured motor vehicle," and 2) the UIM limits of $100,000 will be reduced by the $100,000 received on behalf of the at-fault driver, resulting in no pay out.

Miller's counter-argument is that even if the ordinary reader of average intelligence would understand, taking that language separately from the introductory part of the endorsement, that the off-set is against the $100,000 stated limit of liability rather than against the total amount of uncompensated damages, there is still a contradiction and conflict that renders the policy ambiguous as a whole because, as recognized in *Jones* and *Ritchie*, the ordinary reader of average intelligence may think that the off-set is against the *total* uncompensated damages (rather than against the stated amount of $100,000 as a limit) because of the fact that at the beginning of the endorsement the language says:

> We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle. The bodily injury must be sustained by an insured person and must be caused by accident and arise out of the use of the underinsured motor vehicle. You must notify us of any suit brought to determine the legal liability or damages. Without our written consent we are not bound by any resulting judgment.
>
> We will pay under this coverage only after the limits of liability under all bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

Thus, argues Miller, the real "limit of liability" is the uncompensated bodily injury damages up to $100,000 *in excess of* the amount received from the tortfeasor's insurer. Miller says the trial court got it right that the policy's promise to "pay compensatory damages for bodily injury

which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle," when compared six lines later to the promise to pay under the coverage "only after the limits of liability under all bodily injury bonds or other policies have been exhausted by payment ... [,]" creates an ambiguity. He suggests that the policy implies to an ordinary person of average intelligence a promise to pay benefits *after* the limits of the other liable parties are exhausted.

In support of this proposition, Miller cites *Long v. Shelter Insurance Cos.*, 351 S.W.3d 692, 696, 702 (Mo.App.2011), contending that in looking at comparable language promising to pay "uncompensated damages," the *Long* court concluded that the ordinary insured would read this plain language to mean the UIM endorsement will pay the insured *the excess* over and above what the insured received from others who were liable to the extent of their actual damage.

In the *Long* case, the insurance agreement stated it would pay the insured for "uncompensated damages" arising from a covered accident, and went on to define "uncompensated damages" to mean damages that remain unpaid after liability coverage is exhausted. *Id.* at 702, 705. There was an "other insurance" clause that provided that the UIM coverage provided therein "will apply as excess insurance over any other company's underinsured motorists insurance." *Id.* at 698. Although the definition of underinsured motor vehicle was held to be not ambiguous, the court further held, after consideration of *Jones* and *Ritchie*, that there was an ambiguity, and as a result, the insurer was not entitled to a set-off of the $50,000 paid in behalf of the tortfeasor against the $250,000 "limit of liability," but was entitled to a set-off only against the $400,000

of uncompensated damages within the stacked coverage limit. *Id.* at 704–05.

The decision in *Long* was followed in this court's opinion in *Wasson v. Shelter Mutual Insurance Co.,* 358 S.W.3d 113 (Mo.App.2011). Although this court in *Wasson* first held that the table at the top of the endorsement page was not ambiguous as to whether the endorsement expressly provided coverage of up to $250,000 per person or $500,000 per person, *id.* at 121, when the court turned to the issue of the extent to which the insurer was entitled to set off the prior payments received by the insureds, the court noted that the definition of "uncompensated damages" lacked a limiting phrase such as "up to our limit of liability." *Id.* at 122–23. The result, said the court, was that the definition reads like the policy provides excess insurance. *Id.* at 123.

*Jones v. Mid–Century Insurance Co.,* 287 S.W.3d 687 (Mo. banc 2009), was a case addressing the "set-off" language of an underinsured motorist endorsement. In *Jones,* as in *Wasson* later, there was no limiting language attending the promise to pay up to the limits of liability. The Court held the overall language was inaccurate and misleading. *Id.* at 691–92. The Court in *Jones* held that while subsection a.2.(b) of the endorsement stated it was limited by subsections (a), and (c)-(f), subsection (a) had no similar reference to subsection (f), "indicating it [was] not so limited." *Id.* at 692.

To correct this ambiguity, the Court suggested that "one impliedly would have to insert additional words into subsection (a)(2)" and interpret it to read as follows:

2. **The limits of liability of this coverage minus the amount already paid to that insured person.**[6]

*Id.* at 691.

Here, Mr. Miller's AmFam UIM states as follows:

The limits of liability of this coverage will be reduced by:

1. All payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle.

The issue, therefore, is whether, in view of the entire policy, an ordinary insured of average intelligence would think that the off-set could apply to the $100,000 limit above and beyond the amount received from the tortfeasor's carrier. The Court in *Jones,* though dealing with different but similar language, thought so.

The *Jones* Court also found that the *Rodriguez* case was not in conflict with its interpretation because:

The relevant language of the set-off in *Rodriguez* provided that "the limit of liability shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible." [*Rodriguez,* 808 S.W.2d] at 381. The *Rodriguez dicta* said only that the fact that an insurer will not be called on to pay the full coverage amount listed does not make a particular limitation inherently unenforceable where the policy was clear that any prior payments would be deducted from the coverage amount.

*Jones,* 287 S.W.3d at 692 n. 3. The Court thus distinguished *Rodriguez* on the basis

---

**6.** The underlined portion is what the Court said would have been needed to avoid the ambiguity.

that in *Rodriguez* it was clear that "any prior payments would be deducted from the coverage amount." Significantly, however, the Court went on, in dealing with the issue of how to apply the set-off, to express concern related to the possibility of confusion related to the limits of coverage:

> *Rodriguez* did not give an insurer license to make contrary-to-fact statements about the coverage it provides in a policy. Here, by contrast, the policy expressly states that total coverage will be $100,000, whereas in fact, were Mid-Century's interpretation to be accepted, $100,000 in coverage never would be provided, because in every situation, the $100,000 limit would be reduced further by $25,000, the statutory minimum amount of liability coverage required in Missouri.

*Id.*[7]

*Ritchie v. Allied Property & Casualty Insurance Co.*, 307 S.W.3d 132, 140–41 (Mo. banc 2009), also dealt with an ambiguity arising from the conflict of an "other insurance" clause. There, the Court found an ambiguity resulting in a ruling that the insurer could not set-off the payment the insured received from the tortfeasor against the stated coverage figure (the "limit of liability"), but could set it off only against the total uncompensated damages. In responding to the concerns expressed by the dissent, the Court stated:

> The dissent is incorrect in characterizing this opinion as holding that limitation of liability clauses are never enforceable. A policy that plainly states it only will pay the difference between the amount recovered from the underinsured motorist and $100,000 is enforceable. In such a case, the mere fact that $100,000 will never be paid out is not misleading, for the policy never suggests that this is its liability limit and never implies that it may pay out that amount. That is not the case here, however. The policy says it provides $100,000 in underinsured motorist coverage but, in fact, under the insurer's interpretation of the policy, it will never pay that amount. That creates an ambiguity resolved by giving the language on which the insurer relies an alternative interpretation that will give effect to all of the policy provisions, as the Court holds above and as it held in *Jones*, 287 S.W.3d at 690.

*Ritchie*, 307 S.W.3d at 141 n. 10.

Miller presents, based primarily on language from *Jones* and *Ritchie*, the argument that there is inevitably a factual conflict—or at least confusion—created by the declaration sheet's statement of "coverage" (implying coverage limits) when read in conjunction with the other portions of an endorsement that purport to curtail the stated limits of liability. We grant that unless the ordinary policy holder is advised prior to purchase exactly how *under* insured motorist coverage works, the policy holder may assume that it operates in a manner similar to *un* insured motorist coverage, that is, the policy holder *may as-*

7. Of course, the stated coverage will not *always* be *at least* $25,000 less than the actual available coverage. For instance, in the case of a tortfeasor who is minimally insured, but whose negligence causes bodily injury to multiple victims, the amount to be received by each of the tortfeasor's victims through the tortfeasor's liability insurer may be *much* less than $25,000. In such a case, a victim having stated UIM coverage of up to $100,000 *will* receive more in UIM benefits than $75,000. However, with that quibble aside, the fact remains that the available coverage will always be *something less* than $100,000. It would seem that the purchaser (who may read the declaration sheet but not the terms of the endorsement upon receipt of her or his copy of the policy) should be clearly advised that the coverage is in the nature of gap coverage and not excess coverage.

*sume* that the UIM coverage compensates bodily injury above and beyond anything received from the tortfeasor. Confusion of the ordinary insurance purchaser of UIM coverage is legislatively recognized in Missouri, in that the Missouri General Assembly has adopted legislation to help protect the insurance consumer from purchasing "illusory" coverage. *See* section 379.204.[8] The declarations page here does not help by its use of the word "coverage" (as opposed to "limits of liability") in connection with what it intends to be gap coverage rather than excess coverage. Accordingly, nothing in the *declarations sheet* indicates that if the tortfeasor's insurer pays $100,000 to an injured UIM insured, no benefit is payable to the insured under the UIM coverage. The declarations page states as to UIM coverage:

Underinsured Motorists Coverage—Bodily Injury Only
$100,000 Each Person $300,000 Each Accident

There is *one* limitation expressed here beyond the purported limit of liability, and that is the limitation that this coverage applies to "Bodily Injury" claims only. The expression of that limitation is commendable to avoid confusion as to claims of property damage. The same limitation ("Bodily Injury Only") is expressed as to *un*insured motorists coverage. However, nothing in the declaration sheet indicates that the UIM coverage is, as to its nature and structure, "gap" coverage rather than coverage that is necessarily excess to the tortfeasor's liability coverage.

The law is not concerned merely with what an ordinary insured would be caused to believe from reading his existing policy after a bodily injury has occurred. The law is also concerned with what an ordinary purchaser of insurance would be caused to believe about the coverage from review of the policy upon initial receipt of the policy, *before* an injury has occurred, while there remains time to adjust coverages in light of his or her understanding of the policy contents. *See Burns,* 303 S.W.3d at 509 (the court applies the meaning which would be attached by "an ordinary person of average understanding if *purchasing* insurance" (emphasis added)). The auto insurance purchaser, upon receipt of his policy (perhaps in the mail several weeks after purchase) will certainly read the declaration sheet to ensure no miscommunication about coverage levels, even if the purchaser reads little else. Therefore, it is essential that the language of the declaration sheet be part of the analysis in these UIM cases.[9]

### The Ambiguity

 The trial court here explicitly based its ruling on the endorsement language and did not rest its ruling on the declaration sheet. The court took issue

---

8. That statute provides, in effect, that any purchase of UIM coverage with limits less than $50,000 (twice the amount of mandatory liability coverage) "shall be construed to provide coverage *in excess of* the liability coverage of any underinsured motor vehicle involved in the accident." Section 379.204 (emphasis added). The legislature thus mandates that any such purchase of so-called limits less than $50,000 must be treated as excess coverage rather than gap coverage.

9. The courts do not instruct insurers about what to write. One wonders, however, why the insurers would not take a hint from *Ritchie* in their UIM policies so as to cause the declaration page and the endorsement to communicate the concept that the insurer will pay only "the difference between the amount recovered from the underinsured motorist" (for bodily injury damage) and the sums specified in the declarations. *See Ritchie,* 307 S.W.3d at 141 n. 10.

with AmFam's theory of interpretation by noticing three items it considered flaws in AmFam's argument:

1. The first sentence of the second paragraph of the endorsement, in which AmFam agrees to pay compensatory damages suffered by the insured person, contains *no qualifiers* such as "subject to the following provisions," or "except as limited herein." That sentence says simply:

 We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle.

 The trial court found that this sentence expresses the proposition that AmFam will pay the amount that the claimant is legally entitled to recover for bodily injury damages from the owner or operator of the underinsured motor vehicle.

2. The second sentence of that paragraph ("The bodily injury must be sustained by an insured person and must be caused by accident and arise out of the use of the underinsured motor vehicle") also contains no qualifiers beyond its own words. While the phrase "underinsured motor vehicle" may have a technical meaning in the insurance industry, it will not have such a technical meaning to the ordinary insured. The ordinary insured will view it in a practical way of meaning insurance that is inadequate for the level of damage.

3. The endorsement further provides that AmFam will pay "only after the limits of liability under all bodily injury liability bonds or other policies have been exhausted by pay-

ments of judgments or settlements." This language suggested to the trial court that the insurance is intended to be excess to the tortfeasor's liability insurance.

The trial court believed that putting these three things together, the endorsement sounds as though it is offering coverage that will pay compensatory damages for bodily injury up to $100,000 per person *above and beyond* the coverage provided by the tortfeasor's coverage and all other coverages. The court recognized that *the definition* of "underinsured motor vehicle," taken by itself, was unambiguous, but the court held that the effect of that clear definition and the off-set provision simply created an ambiguity that was required to be resolved in favor of the claimant.

While there is no case directly on point as to the specific operative language relied on by the trial court, the cases such as *Seeck, Jones,* and *Ritchie,* which involved "other insurance" clauses, have similarity to this case in that the court found that *any contradictory language anywhere* in the policy was enough to create an ambiguity that would allow set-off only against total damages. *Jones* and *Ritchie* involved cases of multiple policies, and hence issues of stacking. *Seeck,* like this case, involved only a single policy, but in *Seeck,* as in this case, the ambiguity related to the issue of how to apply the set-off provisions.

The trial court stated that the very early paragraphs of the endorsement expressed *no limitation* that would limit the claim to that of gap coverage. We note that the trial court had in front of it the copy of the policy attached to the parties' stipulation of facts. When terms are *clearly* bolded, and the insured is *clearly* informed of the significance of bolding, the courts will recognize and enforce the definition speci-

fied.[10] *See, e.g., Long,* 351 S.W.3d at 702–03. Here, although the parties did not directly address the issue of bolding, the trial court would *not* have been readily able to discern from the copy of the *policy* that the terms were in fact bolded with any degree of prominence. Though it may sound odd to lawyers accustomed to reading automobile insurance policies with bolded terms, the *purported* bolding of terms in this case (especially without instruction in the endorsement as to the significance of bolding) does nothing to assist the ordinary insured of average intelligence. The reader may judge by reference to the copy of the endorsement attached to this opinion as an appendix.[11]

Accordingly, in this case, we cannot disagree with the trial court that the first two sentences of the second paragraph of the endorsement indicate that the coverage may be excess to the tortfeasor's liability coverage. When the definition and set-off provisions are placed opposite those two sentences setting forth the insuring agreement, and are considered in light of the wording of the declaration page, there is confusion and ambiguity in the policy as a whole about the nature of the coverage.

### Conclusion

Because the trial court did not err in reaching the conclusion that there was an ambiguity that was required to be resolved in favor of the claimant, we affirm the judgment of the trial court.

All concur.

---

10. Here, nothing in the endorsement mentioned the effect of bolded language. The only place in the entire policy that the significance of bolding is mentioned is in the part of the policy providing definitions applicable to the entire policy. In any event, the *purported* bolding in the endorsement simply is inadequate to make clear that there are limiting terms governing the endorsement.

11. The parties stipulated the facts. It would appear that bolding was not a factual matter which was specifically controverted, nor was it necessarily agreed in such a way as to bind the court. The *quotations* in the parties' word-processed stipulation were bolded, but the exhibit failed to demonstrate bolding. While the insured did not intend to "hang his hat" on the issue of non-bolding, to the extent that we consider the evident lack of prominent bolding in upholding the trial court decision, we hold to the principle that this court is not limited to arguments offered by the appellant, but may affirm the trial court on any basis. *See ITT Commercial Fin.,* 854 S.W.2d at 387–88.

# APPENDIX - UIM ENDORSEMENT

## UNDERINSURED MOTORISTS (UIM) COVERAGE ENDORSEMENT - KEEP WITH POLICY

This endorsement forms a part of the policy to which it is attached and replaces any Underinsured Motorists Coverage previously issued as a part of this policy. You have this coverage if Underinsured Motorists Coverage is shown in the declarations.

We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle. The bodily injury must be sustained by an insured person and must be caused by accident and arise out of the use of the underinsured motor vehicle.

You must notify us of any suit brought to determine legal liability or damages. Without our written consent we are not bound by any resulting judgment.

We will pay under this coverage only after the limits of liability under all bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

### ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT ONLY

As used in this endorsement:

1. Insured person means:
 a. You or a relative.
 b. Anyone else occupying your insured car
 c. Anyone, other than a person or organization claiming by right of assignment or subrogation, entitled to recover damages due to bodily injury to you, a relative or another occupant of your insured car

 But the following are not insured persons:
 a. Any person, other than a relative, using your insured car without your permission.
 b. Any person, other than a relative, using your insured car with your permission, but who exceeds the scope of that permission.
 c. Any person using a vehicle without the permission of the person having lawful possession.
 d. Any person using a vehicle with the permission of the person having lawful possession, but who exceeds the scope of that permission.

2. Motor vehicle means a land motor vehicle or a trailer. But, it does not mean a vehicle or equipment:
 a. Operated on rails or crawler-treads.
 b. Designed for use mainly off public roads, except farm tractors/equipment while on public roads.
 c. Parked for camping or housekeeping purposes.

3. Underinsured motor vehicle means a motor vehicle which is insured by a liability bond or policy at the time of the accident which provides bodily injury liability limits less than the limits of liability of this Underinsured Motorists coverage. Underinsured motor vehicle, however, does not mean a vehicle:
 a. Insured under the Liability coverage of this policy
 b. Insured at the time of the accident by a liability bond or policy with bodily injury liability limits below the minimum specified by the financial responsibility law of the state in which your insured car is principally garaged.

c. Owned by or furnished or available for the regular use of you or a relative.
d. Owned or operated by a governmental unit or agency
e. Owned or operated by a self-insurer as considered by any financial responsibility law, motor carrier law, or similar law
f. Which is insured by a bodily injury liability bond or policy at the time of the accident, but the bonding or insuring company denies coverage or is or becomes insolvent.

### EXCLUSIONS

This coverage does not apply for bodily injury to a person:

1. While occupying, or when struck by, a motor vehicle that is not insured under this policy, if it is owned by you or any resident of your household.
2. Who makes or whose legal representative makes a settlement without our written consent.
3. While occupying your insured car when used to carry persons for a charge. This exclusion does not apply to shared-expense car pools or the charitable carrying of persons.

This coverage does not apply to punitive or exemplary damages.

Underinsured Motorists Coverage shall not apply to the benefit of any insurer or self-insurer under any workers' compensation or disability benefits law or any similar law.

### LIMITS OF LIABILITY

The limits of liability of this coverage as shown in the declarations apply, subject to the following:

1. The limit for each person is the maximum for all persons as the result of bodily injury to one person in any one accident.
2. Subject to the limit for each person, the limit for each accident is the maximum for bodily injury sustained by two or more persons in any one accident.

We will pay no more than these maximums no matter how many vehicles described in the declarations, insured persons, claims, claimants or policies or vehicles are involved.

The limits of liability of this coverage may not be added to or stacked onto the limits of liability of any other underinsured motorist coverage issued by us to you or any member of an insured person's household.

We will pay only once for any damages or expenses payable under more than one coverage of this policy. Any damages or expenses paid under any other coverage of this policy are not eligible for payment under this coverage.

The limits of liability of this coverage will be reduced by:

1. All payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for fees caused by an accident with an underinsured motor vehicle.
2. All payments under the Liability coverage of this policy
3. All payments made or amounts payable because of bodily injury under any workers' compensation or disability benefits law or any similar law.

All other terms, agreements, conditions, and provisions remain unchanged.
AMERICAN FAMILY MUTUAL INSURANCE COMPANY
AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN
MADISON, WISCONSIN

END 55.3 (MD) 64. 12/04 Page 1 of 2 Stock No. 2161

**LF 48**

13

# APPENDIX - UIM ENDORSEMENT

**OTHER INSURANCE**

If there are any limits of liability remaining, after applying the reductions provided for in the "Limits of Liability" section of this endorsement and if there is other underinsured motorist insurance provided by another insurance company on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total remaining limits to the remaining limits of all underinsured motorist insurance provided by other insurance companies. But, any remaining limits of insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over all other underinsured motorist insurance provided by all other insurance companies.

All other terms, agreements, conditions, and provisions remain unchanged.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY
AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN
MADISON, WISCONSIN

END. 55-2 (WI) Ed. 12-04 page 2 of 2 Stock No. 24457

LF 49