....
We will pay no more than these maximums no matter how many vehicles described in the declarations, insured persons , claims, claimants or policies or vehicles are involved.
The limits of liability of this coverage may not be added to or stacked onto the limits of liability of any other underinsured motorist coverage issued by us to you or any member of an insured person's household.
....
The limits of liability of this coverage will be reduced by:
1. All payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle .
....
The UIM coverage endorsement to Kissinger's policies also contains an other insurance provision that states:
If there are any limits of liability remaining after applying the reduction provided for in the "Limits of Liability" section of this endorsement and if there is other underinsured motorist insurance provided by another insurance company on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total remaining limits to the remaining limits of all underinsured motorist insurance provided by other insurance companies. But, any remaining limits of insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over all other underinsured motorist insurance provided by all other insurance companies.
In addition to providing UIM coverage, Kissinger's policies also provide medical expense coverage in the amount of $5,000 per person. The medical expense coverage provisions in Kissinger's policies are identical, with each providing: "We will pay reasonable medical expenses for appropriate and necessary medical and funeral services performed within one year of the accident because of an accident related bodily injury to an insured person ." The medical expense coverage provision in Kissinger's policies contains the following limits of liability provision:
Regardless of the number of vehicles described in the declarations, insured persons , claims or policies, or vehicles involved in the accident, we will pay no more than the limit of liability shown for this coverage in the declarations for each person injured in any one accident.
....
Any amount paid or payable for medical expenses under the ... Underinsured Motorists coverages of this policy shall be deducted from the limits of liability under this Part.
Finally, the medical expense coverage provision in Kissinger's policies contains an other insurance provision that states:
If there is other auto medical expense insurance for a loss covered by this Part, we will pay our share according to this policy's proportion of the total of all medical expense limits....
*772 Any insurance provided under this Part for an insured person as a pedestrian or while occupying a vehicle you do not own in excess over any other auto medical expense insurance.
Instant Action
In October 2009, the Plaintiffs filed a wrongful death action against Roberts. In January 2010, the Plaintiffs filed an amended petition, titled Plaintiffs' Amended Petition for Wrongful Death and for Breach of Contract Damages and Declaratory Judgment ("Amended Petition"). In addition to adding Megan's estate and Kissinger in her capacity as personal representative for Megan's estate as plaintiffs, the Amended Petition added American Family as a defendant. The Amended Petition alleged wrongful death against Roberts, and alleged breach of contract and vexatious refusal to pay against American Family. In addition, the Amended Petition asked the trial court to declare the Plaintiffs' and American Family's respective duties, rights, obligations, status, and legal relations under Kitchen's policies and Kissinger's policies.
American Family filed an answer and counterclaim for declaratory relief which asked the trial court to determine whether the UIM coverage and medical expense coverage in Kissinger's policies stack, whether the UIM coverage and medical expense coverage in Kitchen's policies stack, and whether American Family is allowed to reduce its payment for UIM coverage to both Kissinger and Kitchen by the $25,000 paid from Roberts's American Family policy.
The Plaintiffs thereafter sought and secured leave to file another amended petition, which they titled Plaintiffs' First Amended Petition for Wrongful Death and for Breach of Contract Damages and Declaratory Judgment ("First Amended Petition"). The First Amended Petition added American Standard as a named defendant, and the request for leave to amend noted that American Standard is wholly owned by American Family.[5] The First Amended Petition was materially identical to the Amended Petition, though it now asserted all claims for relief against American Family and American Standard, collectively.
In January 2010, the Insurers filed a complaint for interpleader and declaratory relief in the United States District Court for the Western District of Missouri. The court entered an order permitting the Insurers to deposit and interplead $165,000 into the registry of the court. The amount interpleaded represented $75,000 in UIM motorist coverage under Kitchen's policies (the greatest UIM coverage set forth in Kitchen's policies less $25,000 paid to the Plaintiffs from Roberts's policy); $10,000 in medical expense coverage under Kitchen's policies (the greatest medical expense coverage set forth in Kitchen's policies); $75,000 in UIM coverage under Kissinger's policies (the greatest UIM coverage set forth in Kissinger's policies less $25,000 paid to the Plaintiffs from Roberts's policy); and $5,000 in medical expense coverage under Kissinger's policies (the greatest medical expense coverage set forth in Kissinger's policies). The Plaintiffs filed a motion to dismiss the federal court interpleader. The United States District Court granted the motion and ordered the clerk of the court to transfer the interpleaded fund, plus accumulated interested, to the registry of the Clay County Circuit Court. Upon motion by the Plaintiffs, the Clay *773 County trial court ordered the interpleaded funds to be distributed to the Plaintiffs.
The Insurers filed two motions for summary judgment in November 2011. The first motion addressed the Kitchen policies and argued that the Insurers were entitled to summary judgment in their favor because (1) the UIM coverage in Kitchen's policies does not stack under Illinois law; (2) the Insurers were authorized by Illinois statute to reduce the UIM coverage paid to Kitchen by $25,000, the amount paid by Roberts's liability insurer; and (3) the Insurers are not liable for vexatious refusal or breach of contract because Missouri's vexatious refusal statute does not apply to Kitchen's policies or claims, and because Kitchen has been paid all that he is owed under his policies. The second motion addressed the Kissinger policies and argued that the Insurers[6] were entitled to summary judgment in their favor because (1) the UIM coverage in Kissinger's policies does not stack under Missouri law; (2) American Family was entitled to reduce the UIM coverage paid to Kissinger by $25,000, the amount paid by Roberts's liability insurer; and (3) American Family is not liable for vexatious refusal or breach of contract because Kissinger has been paid all that she is owed under her policies.
Both Kitchen and Kissinger filed responses to the Insurers' motions for summary judgment. Kitchen's response argued that Missouri law, and not Illinois law, should apply to determine coverage under his policies because the UIM coverage and medical expense coverage provisions in Kitchen's policies insured against the risk of bodily injury to Megan, a Missouri resident. Kitchen's response further asserted that, under Missouri law, the other insurance provision in Kitchen's policies when read with the anti-stacking provision renders the policies ambiguous. Kitchen's response thus argued that under Missouri law, stacking of the UIM coverage and medical expense coverage in Kitchen's policies is allowed, and that the Insurers are not entitled to reduce the UIM coverage by the $25,000 liability payment from Roberts's policy. Kitchen's response also asserted that, even if Illinois law applies to construe his policies, the result would be the same as if Missouri law applied. Finally, Kitchen's response argued that the Insurers were not entitled to summary judgment on the Plaintiffs' breach of contract and vexatious refusal to pay claims because the Insurers have not paid all that is owed to Plaintiffs and because questions of fact exist as to whether the Insurers vexatiously refused to pay.
Kissinger's response to the Insurer's motions for summary judgment was nearly identical to Kitchen's response, though Kissinger's response did not address the choice of law issue raised in Kitchen's response, as it is uncontested that construction of the Kissinger policies is controlled by Missouri law.
While the Insurers' motions for summary judgment were pending, the trial court severed and tried Plaintiffs' claims against Roberts. The trial court found Roberts 100 percent at fault for the December *774 12, 2008 motor vehicle accident and liable for Megan's injuries and death. The trial court entered judgment in favor of the Plaintiffs and against Roberts on the Plaintiffs' wrongful death claims in the total amount of $2,658,949.15, representing damages in the amount of $2,500,000 and prejudgment interest in the amount of $158,949.15.
In September 2013, the Insurers filed additional motions for summary judgment, one concerning Kitchen's claims and one concerning Kissinger's claims. These motions argued for summary judgment on substantially the same bases as the motions for summary judgment filed in November 2011. The Plaintiffs' responses to the Insurers' September 2013 motions for summary judgment were substantially the same as their responses to the November 2011 motions for summary judgment.
On June 27, 2014, the trial court issued its Findings of Fact, Conclusions of Law, and Judgment Granting Summary Judgment in favor of the Insurers with respect to some of the claims involving Kitchen's policies, and in favor of Kissinger on some of the claims involving the Kissinger policies ("Interlocutory Judgment").
With respect to Kitchen's claims, the Interlocutory Judgment concluded that Illinois substantive law controls the construction of Kitchen's policies because "Illinois has the most significant relationship to the parties, the place of contracting the policies, the place of performance was Illinois, and ... Kitchen resided in Illinois." The Interlocutory Judgment concluded that "Illinois law expressly authorizes the use of anti-stacking language in automobile insurance policies," and that the language used in Kitchen's policies had previously been held in Illinois to unambiguously preclude stacking.
With respect to Kissinger's policies, the Interlocutory Judgment found that under Missouri law, "there is an ambiguity created by the second sentence of the 'other insurance' provision in the Kissinger UIM endorsements because Megan Kitchen was occupying a vehicle she did not own." The Interlocutory Judgment explained that, when the other insurance provisions in the UIM coverage endorsement and in the medical expense coverage provision are read in conjunction with the anti-stacking language, the other insurance provisions become contradictory and ambiguous so that stacking of UIM coverage and medical expense coverage is permitted with no offset or reduction for the liability payment made by Roberts's insurer.
The Interlocutory Judgment found that genuine issues of material fact prevented the entry of summary judgment in favor of the Plaintiffs on their claims for vexatious refusal to pay.
On March 2, 2017, the Plaintiffs and the Insurers filed a stipulation dismissing the vexatious refusal to pay claims with prejudice. On March 6, 2017, the trial court issued its Memorandum and Order Granting Declaratory Judgment ("Final Judgment").[7] The Final Judgment, in reliance *775 on the reasoning expressed in the Interlocutory Judgment, found that the UIM coverage and medical expense coverage in Kitchen's policies do not stack and do permit reduction for the full amount of the liability payment from Roberts's insurer, and that the UIM coverage and medical expense coverage in Kissinger's policies do stack and do not permit reduction for the liability payment from Roberts's insurer.
Kitchen appeals. The Insurers cross appeal.
Standard of Review
While the trial court made a determination that Illinois law governs the interpretation of Kitchen's policies, that choice-of-law determination does not affect our standard of review. "Regardless of which state's law governs the substantive issues involved in this case, ... 'procedural questions are determined by the state law where the action is brought.' " Williams v. Silvola , 234 S.W.3d 396, 399 (Mo. App. W.D. 2007) (quoting Peoples Bank v. Carter , 132 S.W.3d 302, 305 (Mo. App. W.D. 2004) ). "The standard of review is a procedural matter for which this court will apply Missouri law." Id.
Kitchen appeals and the Insurers cross appeal from the trial court's Final Judgment, which interpreted Kissinger's policies and Kitchen's polices. " 'The interpretation of an insurance policy, and the determination of whether coverage and exclusion provisions are ambiguous, are questions of law that [we] review[ ] de novo.' " Mendenhall v. Prop. & Cas. Ins. Co. , 375 S.W.3d 90, 92 (Mo. banc 2012) (quoting Burns v. Smith , 303 S.W.3d 505, 509 (Mo. banc 2010) ). " 'Where, as here, the trial court granted summary judgment, [we] also appl[y] a de novo standard of review.' " Id. (quoting Burns , 303 S.W.3d at 509 ). Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp. , 854 S.W.2d 371, 376 (Mo. banc 1993).
Kitchen's Appeal
Kitchen asserts four points on appeal. In the first, Kitchen argues that the trial court erred in finding that the UIM coverage in Kitchen's policies does not stack because, under either Illinois or Missouri law, Kitchen's policies do not unambiguously preclude Kitchen from collecting the UIM coverage provided by each policy because the other insurance provision in the policies conflicts with the anti-stacking provision, rendering the policies ambiguous. Kitchen's second point on appeal contends that the trial court erred in concluding that Illinois law applies to Kitchen's policies because Missouri has more significant contacts with the issues in this case. Kitchen's third point on appeal asserts that the trial court erred in finding that the medical expense coverage in Kitchen's policies does not stack because the policies did not unambiguously preclude Kitchen from collecting the medical expense coverage provided by each policy because the other insurance provision in the policies conflicts with the anti-stacking provision, rendering the policies ambiguous. Kitchen's fourth and final point on appeal argues that the trial court erred in reducing the UIM coverage in Kitchen's policies by the full amount paid by Roberts's liability insurer. We address Kitchen's points on *776 appeal out of order, as the logical starting point is to determine whether Illinois or Missouri law applies to the interpretation of Kitchen's policies.
Kitchen's Point Two: Choice of Law
Kitchen's second point on appeal contends that, contrary to the trial court's conclusion, Illinois law does not apply to the interpretation of Kitchen's policies. Kitchen claims that Missouri has more significant contacts with the issues in this case because the insured risk, Megan, resided in Missouri; the car accident and the acts triggering coverage occurred in Missouri; the underinsured driver resided in Missouri; the underinsured vehicle was registered and garaged in Missouri; and the underlying litigation was filed in Missouri. Kitchen claims that applying Missouri law to the interpretation of Kitchen's policies would allow stacking of the UIM coverage and the medical expense coverage and would preclude any offset for the amount paid by Roberts's liability policy.
"Missouri has adopted sections 188 and 193 of the Restatement (Second) Conflict of Laws (1971) for determining choice of law issues as they relate to insurance contracts." Accurso v. Amco Ins. Co. , 295 S.W.3d 548, 551 (Mo. App. W.D. 2009). Section 188(1) provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties." In determining which state has the most significant relationship to the contract, we consider "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." However, when determining the validity of an insurance contract and the rights created thereby, section 193 commands that the most important factor to consider is "the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." Comment b to section 193 explains that the principal location of the insured risk is "in the state where it will be during at least the major portion of the insurance period" so that in the case of an automobile liability policy, the principal location of the insured risk is "where the automobile will be garaged at least during most of the period in question."
The Insurers and Kitchen agree that the principal location of the insured risk is the most important factor in determining whether Missouri law or Illinois should apply to the interpretation of Kitchen's policies. The Insurers and Kitchen also agree that, at the time of the accident, Kitchen's vehicles were garaged in Illinois and Megan lived in Missouri. The point of disagreement between the parties is where the principal place of the insured risk lies. The Insurers assert that because Kitchen's four vehicles were garaged in Illinois, Illinois law applies to the interpretation of Kitchen's policies in their entirety. Kitchen disagrees, contending that UIM coverage and medical expense coverage are qualitatively different than liability coverage in that the former insure persons and the latter insures a vehicle. Thus, Kitchen asserts that, with respect to UIM coverage and medical expense coverage, the insured risk was Megan so that the principal location of the insured risk was Missouri.
In Accurso v. Amco Insurance Co. , we were faced with a similar situation. An estranged husband and wife were the named insureds of an automobile liability insurance policy that had uninsured/underinsured motorist limits of $250,000 per person and $500,000 per accident, and were *777 also the named insureds of an excess policy that had uninsured/underinsured motorist limits of $250,000 per person and $500,000 per accident. 295 S.W.3d at 550. After the wife was struck by a car, she sued the driver of the vehicle for negligence and sued her insurers, claiming underinsured motorist benefits. Id. at 549-50. At the time of the accident, the wife lived in Kansas. Id. at 550. However, the automobile liability insurance policy indicated that all five of the insured vehicles had a primary location in Missouri, and indicated an "alternate garaging location" in Kansas for three of the five vehicles insured. Id. at 552. Further, the excess insurance policy indicated its principal address was Missouri. Id. We concluded that, "[b]ecause the location of the insured risk is given greater weight than any other single contact, we believe section 193 of the Restatement resolves this case" so that Missouri law applied. Id.
Nonetheless, we then addressed the factors in section 188 of the Restatement (Second) Conflict of Laws to determine whether Missouri or Kansas had the most significant relationship. Id. Ultimately, we concluded that, although the wife lived in Kansas, Missouri had the most significant relationship to the transaction and the parties. Id. at 553-54. We explained:
Accurso's husband was in Missouri at the time he negotiated and contracted for the insurance policies at issue, and both of the insurance companies involved in this case are located outside of Kansas and Missouri. If the parties negotiate a contract remotely and no single place of negotiation and agreement exists, the place of the negotiation is less important. See RESTATEMENT (SECOND) CONFLICT OF LAWS § 188, comment e. Likewise, the place of performance in this case is uncertain because the parties did not know where future law suits would be brought. "[T]he place of performance can bear little weight in the choice of the applicable law when ... at the time of contracting it is either uncertain or unknown." Id. Moreover, the location of the subject matter of the contract in this case is less certain because the contract does not deal with "a specific physical thing," nor does it "afford protection against a localized risk ..." Id. However, the [automobile liability insurance] policy stated that the five insured motor vehicles had a primary or "principal " location in Missouri and that three of those vehicles had an "alternate garaging location" in Kansas. As for the [excess insurance] policy, the principal address was changed to a Missouri address before the accident occurred in this case. Moreover, before Accurso's accident, the vehicles were registered and licensed in Missouri. The final factor is the domicile, residence, nationality, place of incorporation, and place of business of the parties. Accurso was residing in Kansas at the time of the accident, and her husband was residing in Missouri at the time of the accident. Thus, applying the factors of section 188, the evidence established that the factors were either inapplicable or they weighed in favor of applying Missouri law.
Id. at 553. Thus, we rejected the insurers' contention on appeal that the residence of the wife-the beneficiary of the uninsured/underinsured motorist coverage-controlled where the automobile liability insurance policy and the excess insurance policy would be interpreted.
As we concluded in Accurso , under section 193 of the Restatement (Second) Conflicts of Law, the location of the insured risk-where Kitchen's cars were garaged-is given greater weight than any other single contact so that Illinois law governs the interpretation of Kitchen's *778 policies. However, even if the location of the insured risk is not dispositive, an examination of the factors set forth in section 188 of the Restatement reveals that Illinois has the most significant relationship to the transaction and the parties so that Illinois law applies.
Kitchen was in Illinois at the time he negotiated and contracted for the insurance policies at issue in this case, and while American Family and American Standard had an agent in Illinois, neither American Family nor American Standard were located in either Missouri or Illinois. Thus, the place of negotiation is not important to the choice-of-law analysis required by section 188. Further, as was the case in Accurso , the place of performance of the contract was unknown at the time the parties entered into the contract because Kitchen and the Insurers did not know where future lawsuits would be brought. Also like Accurso , the location of the subject matter of Kitchen's policies is less than certain because the underinsured motorist and medical expense coverage does not insure a specific physical thing or afford protection against a localized risk even though Kitchen's policies indicated that the vehicles insured were garaged in Illinois. The final factor, the domicile, residence, nationality, place of incorporation, and place of business of the parties, weighs toward Illinois because Kitchen resided in Illinois at the time of the accident. As such, application of the factors set forth in section 188 to the evidence in this case demonstrates that the factors were either inapplicable or weighed in favor of applying Illinois law.
Kitchen recognizes in his brief that if we apply the traditional choice-of-law framework set forth in Accurso , Illinois law will apply to the interpretation of his policies. Nonetheless, Kitchen asks us to abandon the traditional choice-of-law framework in favor of applying the location of the insured person's residence when UIM or medical expense coverage is at issue. We decline to do so. "[T]he location of the risk is a matter of intense concern to the parties to the insurance contract" because the "location has an intimate bearing upon the risk's nature and extent and is a factor upon which the terms and conditions of the policy will frequently depend." Section 193, comment c. "It is common knowledge that premiums for an insurance policy are determined, in large part, according to where the vehicle is garaged." Hartzler v. Am. Family Mut. Ins. Co. , 881 S.W.2d 653, 655 (Mo. App. W.D. 1994). Where, as here, a policy provides for UIM coverage and medical expense coverage to a class of persons greater than the named insureds, it would be difficult to calculate premiums properly without knowing which state's law would apply to the interpretation of the policy. Thus, "it can ... be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract." Section 193, comment c. As such, Kitchen and the Insurers, as parties to Kitchen's policies, would have expected Illinois law, the place where Kitchen's vehicles were garaged, to apply to the interpretation of Kitchen's policies and the coverage provided thereby.
Kitchen's second point on appeal is denied.
Kitchen's Points One and Three: Interpreting the UIM Coverage and Medical Expense Coverage Provisions
Kitchen's first and third points on appeal assert that the trial court erred in concluding that Kitchen's policies unambiguously precluded stacking the UIM coverage and medical expense coverage.
*779 Kitchen asserts that, if the other insurance provisions found in the UIM coverage endorsement and the medical expense coverage provision are construed with the anti-stacking provision, an ordinary insured with an average understanding would conclude that, if an injured insured is occupying a non-owned automobile when the injury occurs, the UIM coverage and medical expense coverage stack. In other words, Kitchen asserts that, while Kitchen's policies have unambiguous anti-stacking language, the "other insurance" provisions in the Kitchen policies render the policies ambiguous, entitling Kitchen to stack the UIM and medical expense coverages. Because the other insurance provisions found in both the UIM coverage endorsement and the medical expense coverage provisions are nearly identical, we discuss Kitchen's first and third points on appeal together.
Under Illinois law, an insurance policy is a contract so that the general rules of contract interpretation also apply to the interpretation of insurance policies. Cherry v. Elephant Ins. Co. , 419 Ill.Dec. 851, 94 N.E.3d 1265, 1269 (Ill. App. Ct. 2018). "Where the terms of a policy are clear and unambiguous, the language used will be given its plain meaning; however, if a provision is subject to more than one reasonable interpretation, it is ambiguous and should be construed against the insurer and in favor of the insured." Id. Thus, any "attempt[ ] to limit or exclude coverage must be done clearly, unambiguously, and free of any doubt as to the intended meaning." Id. In determining whether ambiguity exists, Illinois courts read all of the provisions in an insurance contract together to determine whether more than one reasonable interpretation may be reached. Id. at 1270. "Reasonableness is the key, and the touchstone is whether the provision is subject to more than one reasonable interpretation, not whether creative possibilities can be suggested." Id.
Our first task is determining whether the anti-stacking provision found in the general provisions of Kitchen's policies is unambiguous and enforceable under Illinois law. In contrast to Missouri, Illinois statutes require all drivers of vehicles registered in the State of Illinois to secure mandatory UIM coverage. 215 ILL. COMP. STAT. 5/143a-2(4).[8] In addition, Illinois statutes expressly authorize insurers to include anti-stacking provisions in automobile insurance contracts. 215 ILL. COMP. STAT. 5/143a-2(5). Illinois courts have thus readily concluded that anti-stacking clauses "will be enforced as written if the clause is unambiguous." Grzeszczak v. Ill. Farmers Ins. Co. , 168 Ill.2d 216, 213 Ill.Dec. 606, 659 N.E.2d 952, 956 (1995). In Grzeszczak , the anti-stacking clause in question provided:
With respect to any accident or occurrence to which this and any other auto policy issued to you by any member company of the Farmers Insurance Group of Companies applies, the total limit of all liability under all policies shall not exceed the highest applicable limit of liability under any one policy.
Id. at 955. The court found that this language "unambiguously prevents an insured from aggregating the coverage provided by multiple policies" so that the policy clearly and unambiguously prohibited stacking UIM coverage. Id. , 213 Ill.Dec. 606, 659 N.E.2d at 957.
Here, the anti-stacking provision in Kitchen's policies provides: "Two or More Cars Insured . The total limit of *780 our liability under all policies issued to you by us shall not exceed the highest limit of liability under any one policy."[9] The anti-stacking provision in Kitchen's policies is not materially distinguishable from the anti-stacking provision Grzeszczak held to be unambiguous and enforceable under Illinois law. Kitchen does not contest that, standing alone, the anti-stacking provision in his policies is unambiguous and enforceable under both Illinois and Missouri law.[10]
Kitchen argues, however, that the unambiguous anti-stacking provision in the Kitchen policies is rendered ambiguous when read with the other insurance provision found in both the UIM coverage endorsement and the medical expense coverage provision, and that the resulting ambiguity requires those coverages to be stacked.
The UIM coverage endorsement to Kitchen's policies includes the following other insurance provision:
*781 If there is other similar insurance on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total limits of all similar insurance. But, any insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over any other similar insurance.
The medical expense coverage provision in Kitchen's policies includes the following other insurance provision:
If there is other auto medical expense for a loss covered by this Part, we will pay our share according to this policy's proportion of the total of all auto medical expense limits....
Any insurance provided under this Part for an insured person as a pedestrian or while occupying a vehicle you do not own is excess over any other auto medical expense insurance.
Illinois courts have considered whether similar other insurance provisions read with unambiguous anti-stacking provisions render a policy ambiguous as to require stacking of UIM coverage.
In American Family Mutual Insurance Co. v. Martin , the court considered whether an other insurance provision rendered the whole policy, which included an anti-stacking provision, ambiguous so that the UIM coverage stacked. 312 Ill.App.3d 829, 245 Ill.Dec. 384, 728 N.E.2d 115, 118 (2000). The anti-stacking provision stated: "Two or More Cars Insured. The total limit of our liability under all policies issued to you by us shall not exceed the highest limit of liability under any one policy." Id. , 245 Ill.Dec. 384, 728 N.E.2d at 117. The other insurance provision stated: "If there is other similar insurance on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total limits of all similar insurance." Id. The insured argued on appeal that because "the other insurance clause [did] not define 'other insurance,' " it "could conceivably be read as referring to another policy issued by [the insurer]." Id., 245 Ill.Dec. 384, 728 N.E.2d at 118. The Martin court rejected the insured's argument and explained:
The [anti-stacking] provision clearly covers situations where two or more cars belonging to the same insured are covered by policies issued by [the insurer]. It unambiguously provides that in that case [the insurer's] total liability will not exceed the highest liability limit under any one policy. Read in this context, the other insurance clause refers only to a situation where a different policy issued by a different company applies. If this provision were intended to refer to other policies issued by [the insurer], there would be no need to refer to a proportionate share; [the insurer's] proportionate share of liability would always be 100%. Moreover, reading the other insurance clause in this fashion would render the antistacking provision meaningless. The other insurance clause would always "trump" the antistacking provision, rendering it nugatory. Each clause applies to a different situation, and the antistacking clause is simply not ambiguous.
Id.
The Martin decision addressed an anti-stacking provision identical to the one in Kitchen's policies, and an other insurance provision nearly identical to the first sentence in the other insurance provisions included in the UIM coverage endorsement and medical expense coverage provision in Kitchen's policies. Kitchen's argument on appeal, however, does not rely on the first sentence of the other insurance provision in his policies. Instead, Kitchen relies on the second sentence of the other insurance provision in his policies-the *782 sentence that concerns recovery when the person insured occupied a vehicle he or she did not own-to argue that his policies are ambiguous.[11]
The analysis in Martin was extended in Busch v. Country Financial Insurance Co. , 419 Ill.Dec. 919, 95 N.E.3d 40 (Ill. App. Ct. 2018), where the Appellate Court of Illinois concluded that an other insurance provision addressing coverage of an insured did not render the policy ambiguous by referring to "other applicable insurance." In Busch , the decedent was killed by a hit-and-run driver as she attempted to cross a street in St. Louis. Id. , at 42. The decedent's mother sought to recover uninsured motorist coverage from two insurance policies that insured the decedent at the time of the accident. Id. The policies included an anti-stacking provision that stated:
Other Vehicle Insurance with Us. If this policy and any other vehicle insurance policy issued to you or a relative by one of our companies apply to the same accident, the maximum limit of our liability under all the policies will not exceed the highest applicable limit of liability under any one policy.
Id. at 43. The court recognized that, according to Grzeszczak , the anti-stacking provision was unambiguous and enforceable. Id.
The Busch court then considered whether the other insurance provision rendered the policy ambiguous as to permit stacking. Id. The other insurance provision stated:
Other Insurance. If there is other applicable uninsured-underinsured motorists insurance that covers a loss, we will pay our proportionate share of that loss. Our share is the proportion our limits of liability bear to the total of all applicable limits. However, in the case of motor vehicles you do not own, this policy will be excess and will apply only in the amount our limit of liability exceeds the sum of the applicable limits of liability of all other applicable insurance. We will pay only after all other applicable liability limits have been paid.
Id. (emphasis added). The trial court found the policy ambiguous because the other insurance provision in the unowned vehicle sentence of the other insurance provision did not clearly limit itself to insurance issued by other companies.[12] Id. at 43-44. However, the Appellate Court of Illinois reversed:[13]
*783 We disagree and adopt the reasoning of our colleagues in the Second District in American Family Mutual Insurance Co. v. Martin , 312 Ill. App. 3d 829, 833, 245 Ill.Dec. 384, 728 N.E.2d 115 (2000). Reading both provisions together, we find that it is clear that the "Other Vehicle Insurance with Us" provision applies where two or more vehicles belonging to the same insured are covered by policies issued by Country Mutual, and the "Other Insurance" provision refers only to a situation where a different policy issued by a different company applies. See id. If the "Other Insurance" provision were intended to refer to other policies issued by Country Mutual, there would be no need to refer to a proportionate share; Country Mutual's proportionate share of liability would always be 100%. See id. "Moreover, reading the ['O]ther [I]nsurance['] clause in this fashion would render the antistacking provision meaningless." Id. Accordingly, we find that each clause applies to a different situation, and the antistacking clause is simply not ambiguous.
Id. Thus, as had been the case in Martin , the court in Busch found that the reference to "other similar insurance" in an other insurance provision cannot be reasonably read to include within its scope other insurance issued by the same insurer. Id. at 44.
Busch and Martin read together control our resolution of this case. While the other insurance provisions in Busch and Martin are not identical to the other insurance provisions in Kitchen's policies, Kitchen's basis for arguing that the other insurance provisions render his policies ambiguous is the same as that made and rejected in Busch and Martin . Just as the insured argued in Busch and Martin , Kitchen argues that the reference to "any other similar insurance" in his other insurance provisions could be reasonably read to include other insurance issued by the insurer who issued his policies. Busch and Martin plainly conclude to the contrary.[14]
The trial court did not err in concluding that pursuant to Illinois law, Kitchen's policies were not rendered ambiguous by the reference to "any other similar insurance" in the policies' other insurance provisions. Kitchen's first and third points on appeal are denied.
Kitchen's Point Four: Reducing UIM Coverage by Roberts's Liability Payment
Kitchen's final point on appeal challenges the trial court's conclusion that Kitchen's policies allowed the Insurers to reduce the UIM coverage in fact paid to him by the full amount of the $25,000 paid by Roberts's liability insurer. Kitchen concedes that if Illinois law applies to the interpretation of his policies (as we have determined it does), then resolution of this issue is controlled by 215 ILL. COMP. STAT. 5/143a-2(4), which requires reduction or offset of UIM benefits by amounts actually recovered from any other liability policies.[15] Kitchen nonetheless argues that, *784 since the statute requires offset in the amount "actually recovered," his UIM coverage payment should not have been reduced by $25,000, but should only have been reduced by $12,500, the amount he actually recovered from Roberts's policy.
Through its adoption of 215 ILL. COMP. STAT. 5/143a-2(4), Illinois has required all insurance policies issued in the state to include UIM coverage in an equal amount to the uninsured motorist coverage provided by the policy. The statute further provides, in relevant part: "The limits of liability for an insurer providing underinsured motorist coverage shall be the limits of such coverage, less those amounts actually recovered under the applicable bodily injury insurance policies, bonds or other security maintained on the underinsured motor vehicle." Thus, under Illinois law, an offset or reduction in UIM benefits is mandatory.[16] Harris v. St. Paul Fire & Marine Ins. Co. 248 Ill.App.3d 52, 187 Ill.Dec. 739, 618 N.E.2d 330, 333 (1993). At issue in this appeal is the meaning of the statutory phrase "actually recovered."
Illinois courts have considered the meaning of "actually recovered" in several cases. In Gober v. State Farm Mutual Automobile Insurance Co. , the tortfeasor's insurance company offered to settled claims against its insured for bodily injuries and loss of consortium for the liability policy's limits, $20,000. 263 Ill.App.3d 846, 201 Ill.Dec. 584, 636 N.E.2d 1016, 1017 (1994). The plaintiff received $10,000 for his bodily injuries claim, and the plaintiff's wife received $10,000 for her loss of consortium claim. Id. The plaintiff then made a claim for UIM benefits for his bodily injuries under an insurance policy that contained UIM coverage in the amount of $100,000 per person. Id. The plaintiff claimed that he was entitled to $90,000, maintaining that he "actually recovered" $10,000 from the tortfeasor's liability policy. Id. , 201 Ill.Dec. 584, 636 N.E.2d at 1017-18. The insurer disagreed, asserting that the plaintiff was only entitled to $80,000, representing the difference between the per person limit of $100,000 and the $20,000 that the tortfeasor's liability policy paid to the plaintiff and his wife. Id., 201 Ill.Dec. 584, 636 N.E.2d at 1017. The court sided with the insurer, explaining:
[U]nder the Code language invoked by [the plaintiff and his wife], [the insurer] was entitled to reduce the amount it paid to [the plaintiff] by those amounts recovered "under the applicable bodily insurance" on the underinsured vehicle. Consequently, if [the plaintiff's wife] recovered under the bodily injury insurance on [the tortfeasor's] car, [the insurer] properly set off the amount of the recovery.
Id., 201 Ill.Dec. 584, 636 N.E.2d at 1019. The court determined that the record was clear that the tortfeasor's insurance company made payments to both the plaintiff and his wife as a result of the plaintiff's bodily injuries. Id. The court explained *785 that because the tortfeasor's insurance company made a payment to the plaintiff's wife as part of a larger, overall payment for the plaintiff's bodily injuries, the insurer properly reduced the UIM benefit by the $10,000 paid to the plaintiff's wife in addition to the $10,000 paid to the plaintiff. Id. According to the Illinois court, "[t]hat part of the amount may have been paid to one other than the insured himself is simply not significant." Id.
Here, Roberts's policy provided liability coverage in the amount of $25,000. In December 2009, American Family paid into court Roberts's liability coverage of $25,000 under the automobile insurance policy for the vehicle that was involved in the accident that resulted in Megan's death, and the court divided the policy proceeds equally between Kitchen and Kissinger. While the policy proceeds were not entirely distributed to Kitchen, Illinois courts have construed "amounts actually recovered," as used in that 215 ILL. COMP. STAT. 5/143a-2(4), to mean all amounts recovered under the bodily injury insurance policy, regardless of whether part of that amount was paid to someone other than the insured. Thus, it is of no consequence that the proceeds from Roberts's policy were divided equally between Kitchen and Kissinger so that Kitchen only received $12,500. The trial court did not err in concluding that, under Illinois law, the Insurers were entitled to offset the UIM benefit in Kitchen's policies by $25,000, the entire amount paid by Roberts's insurer for Megan's injuries and resulting death.
Kitchen's fourth point on appeal is denied.
The Insurers' Cross Appeal
The Insurers[17] assert three points on their cross appeal, all of which concern the trial court's interpretation of Kissinger's policies. In their first point on appeal, the Insurers argue that the trial court erred in concluding that Kissinger's policies are ambiguous and thus allow UIM coverage to stack. The Insurers' second point on appeal asserts that the trial court erred in concluding that Kissinger's policies are ambiguous and do not permit reduction of the limits of the UIM coverage paid to Kissinger by the payment made by Roberts's liability insurer. In their third point on appeal, the Insurers contend that the trial court erred in concluding that Kissinger's policies are ambiguous and thus allow medical expense coverage to stack. It is uncontested that Missouri law controls our interpretation of the Kissinger policies.
The Insurers' Points One and Three: Interpreting the UIM Coverage Endorsement and the Medical Expense Coverage Provision
The Insurers' first and third points on appeal assert that the trial court erred in concluding that Kissinger's policies were ambiguous, requiring UIM coverage and medical expense coverage to stack. The Insurers argue that the anti-stacking provision in Kissinger's policies is unambiguous, and that the other insurance provisions in the UIM coverage endorsement and the medical expense coverage provision are unambiguous. Because resolution of the Insurers' first and third points on appeal requires us to determine whether Kissinger's policies are rendered ambiguous when the anti-stacking provision is read with the other insurance provisions in the UIM coverage endorsement and the medical expense coverage provision, we address the points collectively.
"When interpreting an insurance policy, [we] give[ ] the policy language its plain meaning, or the meaning *786 that would be attached by an ordinary purchaser of insurance." Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins. , 531 S.W.3d 508, 511 (Mo. banc 2017). If a policy is clear and unambiguous, we construe it as written. Id. If, however, a policy is ambiguous, meaning that "there is duplicity, indistinctness, or uncertainty in the meaning of the language used in the policy" so that it is reasonably open to different constructions, we must construe the policy in favor of the insured. Chamness v. Am. Family Mut. Ins. Co. , 226 S.W.3d 199, 202 (Mo. App. E.D. 2007). In determining whether an ambiguity exists, we must evaluate the policy as a whole rather than focus on an isolated provision. Manner v. Schiermeier , 393 S.W.3d 58, 65 (Mo. banc 2013). We will not create an ambiguity when none exists. Doe Run Resources , 531 S.W.3d at 511.
The question before us is whether the anti-stacking provision in Kissinger's policies read with the other insurance provisions renders the policies ambiguous. Kissinger's policies have an anti-stacking provision which states: "Two or More Cars Insured. The total limit of our liability under all policies issued to you by us shall not exceed the highest limit of liability under any one policy." Further, the UIM coverage endorsement provides that "[t]he limit for each person is the maximum for all persons as the result of bodily injury to one person in any one accident," so that American Family "will pay no more than these maximums not matter how many vehicles described in the declarations, insured persons , claims, claimants or policies or vehicles are involved." The UIM coverage endorsement continues: "The limits of liability of this coverage may not be added to or stacked onto the limits of liability of any other underinsured motorist coverage issued by us to you or any member of an insured person's household." The medical expense coverage provision similarly provides that "[r]egardless of the number of vehicles described in the declarations, insured persons , claims or policies, or vehicles involved in the accident, we will pay no more than the limit of liability shown for this coverage in the declarations for each person injured in any one accident." Kissinger does not contest that when read in isolation, these anti-stacking provisions unambiguously prohibit stacking UIM coverage and medical expense coverage provided by her policies. See Ritchie v. Allied Prop. & Cas. Ins. Co. , 307 S.W.3d 132, 137 (Mo. banc 2009).
However, we must evaluate Kissinger's policies as a whole. Manner , 393 S.W.3d at 65. The trial court concluded that the other insurance provisions in the UIM coverage endorsement and the medical expense coverage provisions, read with the anti-stacking provisions, rendered Kissinger's policies ambiguous. The other insurance provision in the UIM coverage endorsement to Kissinger's policies provides:
If there are any limits of liability remaining after applying the reductions provided for in the "Limits of Liability" section of this endorsement and if there is other underinsured motorist insurance provided by another insurance company on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total remaining limits to the remaining limits of all underinsured motorist insurance provided by other insurance companies. But, any remaining limits of insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over all other underinsured motorist insurance provided by all other insurance companies.
The other insurance provision in the medical expense coverage provision in Kissinger's policies is slightly different, providing:
*787 If there is other auto medical expense insurance for a loss covered by this Part, we will pay our share according to this policy's proportion of the total of all medical expense limits....
Any insurance provided under this Part for an insured person as a pedestrian or while occupying a vehicle you do not own in excess over any other auto medical expense insurance.
Our Supreme Court has addressed whether other insurance provisions read with anti-stacking provisions render an insurance policy ambiguous. In Ritchie v. Allied Property & Casualty Insurance Co. , our Supreme Court considered whether the parents of a woman who was fatally injured while riding as a passenger in the tortfeasor's vehicle were entitled to stack the UIM coverage in a policy purchased by the parents that insured three automobiles. 307 S.W.3d at 134-35. While the single policy insured three vehicles, the parents paid three separate premiums. Id. at 134. The insurance policy in question had a limit of liability provision that purported to limit the recovery for underinsured motorist coverage to the maximum limit of liability listed in the declarations, regardless of the vehicles or premiums shown in the declarations. Id. at 136-37. The Court determined that, in isolation, the limit of liability provision could be interpreted to prohibit stacking of the UIM coverage. Id. at 137. However, the Court recognized that its task was to evaluate the policy as a whole, so it considered whether the policy's other insurance provision rendered the policy ambiguous. Id. The policy's other insurance provision stated, in relevant part: "Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage ." Id. (emphasis added). The Court concluded that "[t]he ... other insurance provision reasonably could be interpreted as superseding the limit of liability provision and making coverage available to the insureds through their own additional underinsured motorist coverages with [the insurer]." Id. at 138. The Court explained:
When [the other insurance provision] is read together with the provisions in which [the insurer] relies, the three subsections suggest that the policy's anti-stacking provisions, which might normally and otherwise apply, do not apply in the special situation where the insured is injured while occupying a non-owned vehicle. Rather, an ordinary person of average understanding reasonably could interpret this other insurance provision to mean that when an injured insured is occupying a non-owned vehicle and there are multiple underinsured motorist coverages, as it is conceded there are here, then each of the underinsured motorist coverages are excess to the other, and, therefore, may be stacked.
Id. at 137-38 (internal citations and quotations omitted). Thus, the Court concluded that the policy had an ambiguity that had to be resolved in favor of the insureds so that the policy authorized stacking the UIM coverage. Id. at 138. Key to the Court's conclusion was the fact that the phrase "any other collectible underinsured motorist coverage" could reasonably be read to include other UIM coverage provided by the same insurer.
Our Supreme Court again considered whether an other insurance provision read with an anti-stacking provision renders a policy ambiguous in Manner v. Schiermeier . In Manner , a motorcyclist was injured while riding a motorcycle he claimed he did not own, and sought to recover the UIM coverage in three policies he purchased and a policy his father owned. 393 S.W.3d at 60-61. The policies had a "Two *788 or More Cars Insured" provision that is identical to the anti-stacking provision in Kissinger's policies. Id. at 64. The insurers claimed that the anti-stacking provision expressly precluded stacking the UIM coverage in the four policies. Id. at 64-65. But the Court observed that the insurers' argument ignored the policies' other insurance provision, which provided:
If there is other similar insurance on a loss covered by this endorsement, we will pay our share according to this policy's proportion of the total limits of all similar insurance. But, any insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over any other similar insurance .
Id. at 65. (emphasis added). Relying on Ritchie , the Court found that the other insurance provision rendered the policies ambiguous so that stacking of UIM coverage was permitted. Id. at 65-66. The Court explained:
[T]he second sentence of the "other insurance" clause appears to an "ordinary person of average understanding" to permit stacking because it states that "any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage." To the extent that this is inconsistent with other provisions of the policy such as the "Two or More Cars Insured" provision, the resulting ambiguity must be resolved in favor of the insured.
Id. at 66.
As in Ritchie , the holding in Manner turned on the fact that the phrase "any other similar insurance" could be read by an ordinary person of average understanding to include UIM coverage in other insurance policies issued by the same insurer. Both Ritchie and Manner thus concluded that because an average person of ordinary understanding could read the "other insurance" provisions to refer to other UIM coverage provided by the same insurer, the policies were rendered ambiguous, permitting UIM coverage to stack.
Kissinger argues that Ritchie and Manner are controlling in interpreting her policies. The Insurers argue that Ritchie and Manner are not controlling, because the "other similar insurance" language at issue in the second sentence of the other insurance provisions in those cases does not appear in Kissinger's policies.
In Kissinger's policies, the second sentence of the other insurance provision in the UIM coverage endorsement is indeed different from the second sentence of the same provision in the Ritchie and Manner policies. The second sentence of the other insurance provision in the UIM coverage endorsement in Kissinger's policies provides that "any remaining limits of insurance provided under this endorsement for an insured person while occupying a vehicle you do not own is excess over all other underinsured motorist insurance provided by all other insurance companies ." (Final emphasis added.) The Insurers argue that the phrase "by all other insurance companies" is materially different from the phrase "any other collectible underinsured motorist coverage" ( Ritchie ) and the phrase "any other similar insurance" ( Manner ). The Insurers argue that the phrase "by all other insurance companies" unambiguously means insurance companies other than the Insurers, and could not be read by an ordinary person of average understanding to include other policies issued by the same insurer.
The trial court concluded to the contrary and found that "[t]he ambiguity identified in [ Ritchie , Manner and other cases] is not cured by American Family's *789 change in the 12/04[18] UIM endorsement language...."[19] This was legally erroneous. The phrases "other collectible underinsured motorist coverage" and "other similar insurance" at issue in Ritchie and Manner did not differentiate between, or refer in any manner to, the company issuing the "other coverage or insurance," permitting an ordinary person of average understanding to conclude that "other coverage or insurance" meant just that-other coverage or insurance by whomever issued . In contrast, the phrase "by all other insurance companies" plainly and unambiguously comments on who has issued the other UIM coverage or insurance, and has no reasonable meaning except to differentiate between the Insurers and all other companies issuing policies affording similar coverage. We conclude, therefore, that the other insurance provision in the UIM endorsement in Kissinger's policies does not conflict with the anti-stacking provisions in Kissinger's policies as to render Kissinger's policies ambiguous. The UIM coverage afforded by Kissinger's policies cannot be stacked. The trial court erred in concluding to the contrary.
We do not reach the same conclusion, however, with respect to the medical expense coverage in Kissinger's policies. The other insurance provision in the medical expense coverage provision provides, in relevant part, "[a]ny insurance provided under this Part for an insured person as a pedestrian or while occupying a vehicle you do not own is excess over any other auto medical expense insurance." This other insurance provision suffers from the same ambiguity at issue in Ritchie and Manner . The phrase, "any other auto medical expense insurance," could be read by an ordinary person of average understanding to mean medical expense coverage in other insurance policies issued by American Family. Thus, the trial court did not err in concluding that the other insurance provision in the medical expense coverage provision in Kissinger's policies, when read with the anti-stacking provision, rendered the policies ambiguous so that medical expense coverage stacks.
The Insurers' first point on appeal is granted, and the Insurers' third point on appeal is denied.
The Insurers' Point Two: Reducing UIM Coverage by Roberts's Insurance Payment
The Insurers' second point on appeal asserts that the trial court erred in concluding that the UIM coverage they paid Kissinger could not be reduced by the *790 $25,000 payment from Roberts's liability insurer. The Insurers argue that because Kissinger's policies do not promise to pay the limits of liability set forth on the declarations page, and instead define the UIM liability limit by what American Family will not pay, an ordinary person of average understanding would not reasonably expect American Family to pay the entire amount of the UIM limit of liability.
Once again, the Insurers' second point on appeal requires us to determine whether Kissinger's policies are ambiguous. As noted supra , an insurance policy is ambiguous if "there is duplicity, indistinctness, or uncertainty in the meaning of the language used in the policy" so that it is reasonably open to different constructions. Chamness , 226 S.W.3d at 202. If Kissinger's policies are ambiguous, they will be construed against the Insurers. Id.
Kissinger's policies generally provide: "We will insure you for the coverages and the limits of liability as shown in the declarations of this policy." The declarations provide that each policy includes an endorsement for UIM coverage for bodily injury in the amount of $100,000 per person and $300,000 per accident. The UIM endorsement provides, in relevant part:
We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle . The bodily injury must be sustained by an insured person and must be caused by accident and arise out of the use of the underinsured motor vehicle .
....
We will pay under this coverage only after the limits of liability under all bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.
The underinsured motorist endorsement then sets forth a Limits of Liability provision which states, in relevant part:
The limits of liability of this coverage as shown in the declarations apply, subject to the following:
1. The limit for each person is the maximum for all persons as the result of bodily injury to one person in any one accident.
....
We will pay no more than these maximums no matter how many vehicles described in the declarations, insured persons , claims, claimants or policies or vehicles are involved.
The limits of liability of this coverage may not be added to or stacked onto the limits of liability of any other underinsured motorist coverage issued by us to you or any member of an insured person's household.
....
The limits of liability of this coverage will be reduced by:
1. All payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle .
....
Our Supreme Court considered whether similar insurance provisions were ambiguous as to preclude reduction of UIM coverage in a pair of 2009 decisions.
In Jones v. Mid-Century Insurance Co. , the Court considered whether a provision unambiguously permitted offsetting UIM coverage by a liability payment made from an underinsured tortfeasor. 287 S.W.3d 687, 689 (Mo. banc 2009). The plaintiff, who had a policy that included UIM coverage in the amount of $100,000 per person, was paid $50,000 from the tortfeasor for *791 damages suffered as a result of the accident. Id. The plaintiff, who was stipulated to have more than $150,000 in damages, sought to recover the entire $100,000 policy limit for UIM coverage. Id. The insurer argued that it was only liable for $50,000 because the policy allowed the insurer to deduct any amounts the plaintiff received from the tortfeasor from the UIM coverage limits. Id.
The Jones policy had a limit of liability provision that provided:
a. Our liability under the UNDERinsured Motorist Coverage cannot exceed the limits of the UNDERinsured Motorist Coverage stated in the policy, and the most we will pay will be the lesser of:
1. The difference between the amount of an insured person's damages for bodily injury, and the amount paid to that insured person by or for any person or organization who is or may be held legally liable for the bodily injury; or
2. The limits of liability for this coverage.
b. Subject to subsections a. and c.-h. in this Limits of Liability section, we will pay up to the limits of liability shown in the schedule below as shown in the Declarations.
Id. at 690. The Jones policy then provided:
f. The amount of UNDERinsured Motorist Coverage we will pay shall be reduced by any amount paid or payable to or for an insured person;
i. by or for any person or organization who is or may be held legally liable for the bodily injury to an insured person; or
ii. for bodily injury under the liability coverage of this policy.
Id. At issue on appeal was whether subsection (f) conflicted with subsections (a) and (b). Id. at 691.
The Jones Court concluded that a reasonable construction of subsection (a) was that the insurer would pay $100,000 if it was the lesser of the two damage amounts listed. Id. at 690-91. Subsection (b) provided that the insurer would pay up to the limits of liability listed in the declarations, which was $100,000. Id. at 691. While subsection (f) purported to reduce recovery for UIM coverage for bodily injury, the Court found that "[s]uch a construction ... is, at best, in conflict with the clear intent of subsections (a) and (b), and is, at worst, misleading." Id. The Court recognized that, if subsection (f) were construed to mean that any amount paid to the insured was deducted from the coverage limit, then subsection (f) would "make inaccurate and misleading subsection (b)'s statement that it 'will pay up to the limits of liability shown in the schedule below as shown in the Declarations'-that is, that it will pay up to $100,000." Id. at 692. The Court explained that, if any amount paid to the insured would be deducted from the UIM coverage limit, then the insurer would never be required to pay its total limit of liability because, in the case of UIM coverage, as opposed to uninsured motorist coverage, some amount will have always been received from the tortfeasor. Id. Thus, the Court held that subsections (a) and (b) promised coverage that subsection (f) took away so that the policy was ambiguous. Id. However, the Court concluded that an alternative interpretation of subsection (f) existed to give meaning to all subsections of the coverage provision, explaining:
In stating that "[t]he amount of UNDERinsured Motorist Coverage we will pay shall be reduced by any amount paid or payable to or for an insured person" subsection (f) simply means that *792 in determining the total damages to which the underinsured motorist coverage will be applied, the amount of money already received from the tortfeasor must be deducted.
Id. at 693.
In Ritchie v. Allied Property & Casualty Insurance Co. , our Supreme Court again considered whether an offset provision unambiguously allowed the insurer to reduce the amount of UIM coverage by the amount paid by the tortfeasor. 307 S.W.3d at 139-40. The relevant offset provision provided that the "limit of liability shall be reduced by all sums ... [p]aid because of 'bodily injury' or by or on behalf of persons [or] organizations who may be legally responsible...." Id. at 140. The Court concluded that the analysis set forth in Jones applied directly to the dispute in Ritchie . Id. The Court recognized that "[b]oth the declarations page for the policy and the limit of liability provision state that coverage is provided up to $100,000 per person, $300,000 per accident, for each of the three vehicles the [plaintiffs] owned, and in multiple places, state that 'this is the most we will pay' and that this limit of liability is the maximum it will pay." Id. The Court concluded that to allow the insurer to offset the UIM coverage by the amount paid by the tortfeasor would result in the offset provision taking away coverage already promised in the contract. Id. Thus, the Court concluded that the policy was ambiguous. Id. at 140-41. The Court then followed Jones , concluding that the offset provision meant that, in determining the damages to which the UIM coverage applied, the amount of money already received from the tortfeasor would be deducted from the total damages. Id. at 141 ; see also Manner , 393 S.W.3d at 66 (reaching the same result).
The Insurers claim that Jones and Ritchie are inapplicable because, in contrast to the policies at issue in those cases that allowed the offset to be taken against the insured's damages , Kissinger's policies explicitly state that the offset is to be taken against the limits of liability of the UIM coverage . Further, the Insurers assert that, unlike the policies in Jones and Ritchie , Kissinger's policies do not indicate that American Family will pay up to the limits of liability shown in the declarations; instead, Kissinger's policies state that American Family will pay "no more than these maximums." According to the Insurers, Kissinger's policies define the UIM coverage by what American Family will not pay so that it does not create the expectation that the UIM coverage limit would be paid.
The Insurers's argument ignores that we considered nearly identical policy language in Miller v. Ho Kun Yun , 400 S.W.3d 779 (Mo. App. W.D. 2013). At issue in Miller was whether an identical policy provision defined "underinsured motor vehicle" unambiguously so as to preclude payment of UIM benefits. Id. at 781. We concluded that when the definition of "underinsured motor vehicle" and offset provisions were considered with the UIM coverage provision and the declarations, "there is confusion and ambiguity in the policy as a whole about the nature of the coverage." Id. at 793. We explained the importance of the declarations:
We grant that unless the ordinary policy holder is advised prior to purchase exactly how under insured motorist coverage works, the policy holder may assume that it operates in a manner similar to un insured motorist coverage, that is, the policy holder may assume that the UIM coverage compensates bodily injury above and beyond anything received from the tortfeasor.... The declarations page here does not help by its use of the word *793 "coverage" (as opposed to "limits of liability") in connection with what it intends to be gap coverage rather than excess coverage. Accordingly, nothing in the declarations sheet indicates that if the tortfeasor's insurer pays $100,000 to an injured UIM insured, no benefit is payable to the insured under the UIM coverage....
...
However, nothing in the declaration sheet indicates that the UIM coverage is, as to its nature and structure, "gap" coverage rather than coverage that is necessarily excess to the tortfeasor's liability coverage.
The law is not concerned merely with what an ordinary insured would be caused to believe from reading his existing policy after a bodily injury has occurred. The law is also concerned with what an ordinary purchaser of insurance would be caused to believe about the coverage from review of the policy upon initial receipt of the policy, before an injury has occurred, while there remains time to adjust coverages in light of his or her understanding of the policy contents. The auto insurance purchaser, upon receipt of his policy (perhaps in the mail several weeks after purchase) will certainly read the declaration sheet to ensure no miscommunication about coverage levels, even if the purchaser reads little else.
Id. at 790-91 (citation omitted).
While the issue in Miller was whether the definition of "underinsured motor vehicle" was unambiguous, the same logic applies here. Like the policy's declarations in Miller , the declarations to Kissinger's policies indicate that each policy provides UIM coverage in the amount of $100,000 per person and $300,000 per accident. The declarations do not indicate that this coverage could be reduced by any amount, or that the coverage is, in effect, gap (as opposed to excess) coverage. Further complicating matters, the reduction provision in the UIM endorsement appears after the endorsement promises to "pay compensatory damages for bodily injury for which an insured person is entitled to recover from the operator of an underinsured motor vehicle " and after the limits of liability are established "as [those] shown in the declarations." It is only then that the UIM endorsement provides that the limits of liability may be reduced by payments made by or on behalf of the tortfeasor.
Miller held that this same policy scheme creates "confusion and ambiguity in the policy as a whole about the nature of the coverage." 400 S.W.3d at 793. We agree. Like the policies in Jones and Ritchie , Kissinger's policies have provisions that promise UIM coverage in a manner that suggests the coverage is excess coverage, and then another provision that purports to convert the coverage to gap coverage. This renders Kissinger's policies ambiguous. See Ritchie , 307 S.W.3d at 140-41. Thus, when Kissinger's policies indicate that "[t]he limits of liability of this coverage will be reduced by ... [a]ll payments made or amounts payable by or on behalf of all persons or organizations which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle," Kissinger's policies must be construed against the Insurers to mean that "in determining the total damages to which the underinsured motorist coverage will be applied, the amount of money already received by the tortfeasor must be deducted." Jones , 287 S.W.3d at 693.
As applied to this case, the trial court determined that the Plaintiffs had been damaged in the amount of $2,500,000 by virtue of Megan's death, and that the Plaintiffs had received $25,000 from Roberts's policy's liability coverage, leaving uncompensated damages in the amount of *794 $2,475,000. This amount is far more than Kissinger's $100,000 in UIM coverage, requiring American Family to pay its full limit of liability to Kissinger for UIM coverage without reduction.
The Insurers' second point on appeal is denied.
Conclusion
We reverse the Final Judgment insofar as it concludes that Kissinger's policies are ambiguous requiring UIM coverage to stack. We affirm the Final Judgment in all other respects. Pursuant to Rule 84.14, we are to "give such judgment as the court ought to give," and to "dispose finally of the case" where possible. In light of our limited reversal of the Final Judgment, and in accordance with Rule 84.14, we modify paragraph 2 of the Conclusion section of the Final Judgment to read as follows: "2. The UIM coverage in Kissinger's policies does not stack and cannot be reduced by the liability payment received from Roberts's insurer. The medical expense coverage in Kissinger's policies does stack."
All concur

All of the policies at issue in this case reflect on their face that they were issued by either American Family or American Standard as "A Member of the American Family Insurance Group Madison, WI."

Though Kissinger's policies were both issued by American Family, both American Family and American Standard filed the motion for summary judgment addressing Kissinger's policies. All of the parties in this case blurred discussion of and reference to American Family and American Standard more often than not, suggesting that beyond the technical difference in the named issuing company for Kitchen's policies, the parties viewed American Family and American Standard as essentially the same insurer, as each policy identified the issuer as a member of the American Family Insurance Group Madison, WI. Our references to the Insurers in addressing pleadings involving the Kissinger policies is thus not by accident, and is instead true to the pleadings in the legal file.

In order to constitute a final judgment from which an appeal may lie, Rule 74.01(a) requires that the writing be signed by the judge and denominated a "judgment" or "decree." The trial court's March 6, 2017 ruling is designated "Memorandum and Order Granting Declaratory Judgment," and the body of the ruling indicates that the order "shall have the force and effect of a final Judgment." " 'Whether the designation 'judgment' appears as a heading at the top of the writing, within the body of the writing in some other manner, or in the entry on the docket sheet, it must be clear from the writing that the document or entry is being 'called' a 'judgment' by the trial court." City of St. Louis v. Hughes , 950 S.W.2d 850, 853 (Mo. banc 1997). While the trial court could have simply designated its March 6, 2017 ruling as a "Judgment," the ruling's title and body indicate that the trial court's intent was to call it a "judgment," so the denomination requirement of Rule 74.01(a) has been met.

All references to Illinois statutes are current through P.A. 100-628 of the 2018 Regular Session.

Kitchen's American Standard motorcycle policy is slightly different. See supra note 2.

Though never raised as a theory for seeking coverage in his petition, nor as an argument with the trial court in response to American Family's motion for summary judgment, nor captured as a claim of error in any of his points on appeal, in the argument portion of Kitchen's brief, Kitchen argues for the first time that the unambiguous anti-stacking provision in his policies requires stacking in his case because two of his policies were issued by American Family and two of his policies were issued by American Standard. Kitchen bases this argument on the fact that the anti-stacking provision in his policies refers to "[t]he total limit of our liability under all policies issued to you by us shall not exceed the highest limit of liability under any one policy," and on the fact that the Kitchen policies define "we," "us," and "our" as "the company providing this insurance." Thus, Kitchen argues that he is allowed to stack the highest limit of liability under Kitchen's American Family policies with Kitchen's American Standard policies, and that he is allowed to stack all coverage provided by Kitchen's American Standard policies because one is an automobile policy and one is a motorcycle policy. [Appellant's Brief, p. 35]
This new argument is not preserved for our review. It is plainly outside the scope of Kitchen's first and third points relied on, which urge us to find that stacking is required because the Kitchen policies are rendered ambiguous when the other insurance provision is read with the anti-stacking provision. " 'We do not review arguments and issues raised in the argument under a point that are not fairly encompassed by that point.' " Fesenmeyer v. Land Bank of Kansas City , 453 S.W.3d 271, 274 (Mo. App. W.D. 2014) (quoting Nichols v. Div. of Emp't Sec. , 399 S.W.3d 901, 904 (Mo. App. W.D. 2013) ). None of Kitchen's points on appeal claim error in the grant of summary judgment because the Kitchen policies unambiguously require stacking.
In addition, Kitchen's new argument is not preserved for our review because it was never raised with the trial court. When reviewing the trial court's grant of summary judgment, " 'we are confined to addressing only those issues properly raised in the defendant['s] motion[ ] for summary judgment and the responses thereto.' " Rapp v. Eagle Plumbing, Inc. , 440 S.W.3d 519, 523 (Mo. App. E.D. 2014) (quoting Heffernan v. Reinhold , 73 S.W.3d 659, 663 (Mo. App. E.D. 2002) ). In other words, " '[p]arties are bound by the position they took in the trial court and will not be heard on a different theory on appeal.' " Id. (quoting Country Mut. Ins. Co. v. Matney , 25 S.W.3d 651, 654 (Mo. App. W.D. 2000) ). At the trial court, Kitchen argued only that he was entitled to stack because the other insurance provisions rendered the anti-stacking provisions ambiguous. We "will not convict a trial court of error on an issue that was never presented to the trial court for its consideration." Id. at 524.
Moreover, it is not at all clear cut that the phrase "the company providing this insurance" would require differentiation between American Standard and American Family, as all of Kitchen's policies clearly indicated that they were issued by each insurer as a member of the American Family Insurance Group Madison, WI. Regardless, because the theory for claiming coverage was not raised below nor alleged as a basis to assert trial court error in a point relied on, we need not resolve the issue.

Similarly, in American Family Mutual Insurance Group v. Vidakovic , the Appellate Court of Illinois considered whether an other insurance provision created an ambiguity so that, despite the anti-stacking provision, an insured could stack uninsured motorist coverage from two policies. 2011 WL 10457475, at *5 (Ill. App. Ct. 2011). Unlike the other insurance provision in Martin , the other insurance provision in Vidakovic included a second sentence that was nearly identical to the second sentence in the other insurance provision in Kitchen's policies. Id. As in Martin , the court in Vidakovic concluded that the other insurance provision did not render the anti-stacking provision of the policy ambiguous. Id. at *6. However, the court noted that "the second sentence in [the other insurance clause was] inapplicable [to resolving the question of ambiguity] because [the insured] was not occupying a vehicle at the time of the accident." Id. at *5. Thus, Vidakovic , like Martin , is persuasive but not controlling.

As we discuss, infra , in connection with the Kissinger policies, settled Missouri precedent aligns with the result reached by the Illinois trial court where an other insurance provision uses a phrase like "other similar insurance." However, because Illinois law applies to our construction of the Kitchen policies, it is immaterial that a different result would be reached under Missouri law.

The insurer appealed the trial court's decision to the Appellate Court of Illinois, which initially affirmed the trial court. See Busch v. Country Fin. Ins. Co. , 2017 IL App. (5th) 140621-U, 2017 WL 1383960. However, the insurer filed a petition for rehearing, which the Appellate Court of Illinois granted, after which it reversed the trial court. In the Appellant's Brief, Kitchen cites to the 2017 decision by the Appellate Court of Illinois which affirmed the trial court's determination of ambiguity. However, that decision has been vacated, and has no precedential value. Appellant's Brief was filed before the Appellate Court of Illinois granted its petition for rehearing and its 2018 opinion reversing the trial court.

See supra note 12.

As we explain, infra , in connection with our discussion of Kissinger's policies, under Missouri law, policy provisions purporting to permit reduction of available UIM coverage by amounts paid from other liability insurance have been found to be ambiguous, and thus limited in their effect to permitting amounts paid from other liability insurance to reduce the total damages incurred to determine the net amount against which available UIM coverage can be recovered.

Consistent with that requirement, the underinsured motorist endorsement to Kitchen's policies provides:
The limits of liability of this coverage will be reduced by ... [a] payment made or amount payable by or on behalf of any person or organization which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle.

See supra note 6.

As noted, supra , when Kissinger's policies were first issued, the UIM coverage endorsement was on policy form "7/91." However, at some point, the UIM coverage endorsement to Kissinger's polices was changed to a "12/04" policy form.

The trial court supported this conclusion by noting that American Family's later modification of its UIM coverage endorsement policy form in "8/09" constituted evidence that American Family recognized that the other insurance provision in the "12/04" UIM coverage endorsement policy form remained ambiguous. This rationale is flawed for two reasons. First, there is no authority for the proposition that an insurer's change in a standard policy form supports the inference that the insurer believed its earlier form to be ambiguous. In addition, the "8/09" UIM endorsement policy form added a new subsection to the other insurance provision that simply restates the "two or more policies" anti-stacking language found in the general provisions of the base policy form. The second subsection in the other insurance provision of the "8/09" UIM coverage endorsement policy form is identical the other insurance provision in the "12/04" UIM endorsement policy form. In other words, the key language at issue in determining whether Kissinger's policies are ambiguous did not change when the Insurers modified the UIM coverage endorsement policy form in "8/09."